Alonzo **MALONE**, Appellant,

v.

**STATE of Indiana**, Appellee.

No. 681S171.

Supreme Court of Indiana.

Nov. 24, 1982.

**1340**

Susan K. Carpenter, Public Defender of Indiana, David P. Freund, Deputy Public Defender, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen. of Indiana, Dan S. LaRue, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Appellant Alonzo Malone was tried by a jury in the Elkhart Superior Court and found guilty of rape, a class B felony according to Ind.Code § 35–42–4–1 (Burns 1979), burglary, a class B felony according to Ind.Code § 35–43–2–1 (Burns Supp.1982) and battery resulting in serious bodily harm, a class A misdemeanor according to Ind.Code § 35–42–2–1 (Burns Supp.1982). The trial court found that the burglary and battery offenses merged into the rape conviction. On November 26, 1980, Malone was sentenced to fourteen years imprisonment on the rape. He now directly appeals.

Appellant alleges in this appeal the following issues:

1. The trial court erred in denying Appellant's Motion in Limine thereby erroneously permitting a witness, V.H., to testify about an unrelated rape allegedly committed by Malone;

2. The trial court erred in refusing to permit Malone to cross-examine V.H. during the State's offer to prove that V.H. should be permitted to testify before the jury; and

3. The verdicts are in error and contrary to law because they are not supported by sufficient evidence.

The crux of this case is whether or not the purported victim, P.C., consented to Appellant's actions. There is no identification issue. There is no question that Malone and P.C. engaged in the alleged sexual intercourse. The problem is whether Malone entered P.C.'s home without her permission and forced her to have sexual relations against her will. Both Malone and P.C. presented contradictory stories about what transpired between them.

P.C. stated her story as follows. P.C. was introduced to Malone by Oddie Honorable, a mutual friend, at the end of September, 1979. She also had been friends with Malone's brother. P.C.'s apartment was approximately four blocks from Malone's apartment. She visited Malone in his home about five times, drinking an alcoholic beverage with him at least once. On several other occasions, she drank with Malone while he was visiting in her apartment. P.C. testified that she never had sexual relations with Malone before the night in which he raped her.

P.C. further testified that while she was entertaining neighbors in her home during the evening of October 29, 1979, the lights went out. While P.C. was in her kitchen attempting to restore the lights, Malone appeared uninvited at P.C.'s front door. One of P.C.'s guests let him in. P.C. said she asked everyone to leave hoping Malone would also go. She wanted Malone to leave because he previously had been rude and because she had found small amounts of money and food missing after his recent visits to her apartment. She never actually saw Malone take anything and never reported any of the alleged thefts to the police. Nonetheless, she had told Malone not to ever come back to her apartment. Honorable, at the party before Malone arrived, stayed behind with Malone after

P.C.'s other guests left. When specifically asked to leave, Malone complained that P.C. had given away the pint of Scotch liquor he had brought with him. An argument ensued. While Honorable minded P.C.'s two sons, P.C. went out and purchased a half-pint of liquor to placate Malone. She gave the liquor to Malone and again asked him to leave. He got louder and slapped P.C. at least five times, repeatedly pushing her to the floor. She testified that she did not strike Malone first. She also testified that she had been drinking and screamed at Malone. As a result of Malone's beating, P.C. suffered two black eyes and multiple bruises to her legs, arms and face. She said she became groggy and dizzy. The fight drew to a conclusion when P.C. grabbed a large empty liquor bottle and hit Malone on his head with it. Malone grabbed at her shirt. Backing up, P.C. fell out a window causing her shirt to be pulled completely off. Malone allegedly snatched her keys, went out the door, threw the keys and ran off down the street laughing. P.C. said she found her keys the next day.

Oddie Honorable was called by the State and testified that he was in P.C.'s one-bedroom apartment during the entire fight between P.C. and Malone. He said Malone arrived sober and with a bottle of liquor. He also said the fight started when Malone, realizing his liquor was gone, accused P.C. of taking his liquor whereupon P.C. slapped Malone in his face. Honorable testified that P.C. hit Malone first. He further testified that Malone knocked P.C. down only once and probably hit her no more than three times. He said P.C. did not do "too bad" as a fighter. He also said P.C.'s keys were found soon after Malone ran off. He did not know who had thrown the keys but suggested P.C.'s children might have. Honorable testified that he left P.C. when her keys were found.

P.C.'s story continues. She testified that Malone returned to her house alone approximately thirty minutes after having run off. Her door was closed and padlocked from the inside with the key lost outside. When Malone pushed out some plastic covering a

broken window, P.C. noticed him and told him to leave her alone since she was hurt. He told her that he had bought for her a half-pint of liquor to make amends for the earlier fight. P.C. said she knew he was trying to apologize but asked him to leave anyway. Instead, he climbed through the window into her apartment. As Malone continued to apologize, he informed her that he intended to spend the night. He sat on her bed in what doubled as P.C.'s bedroom and livingroom. When she approached to urge him to leave, Malone took her arm and pulled her onto the bed with him. Malone told P.C. he "wanted to make love" to her. Although he never struck her during this second visit, P.C. said she was nonetheless afraid because of Malone's earlier rage and beating and therefore let him have his way. She took off her own clothes and submitted to sexual intercourse. Afterwards, Malone fell asleep. P.C. testified that she subsequently got up and walked around her apartment hoping Malone would awaken and leave. She had neither a phone nor a car. She did not attempt to take her sons out through a window because she feared they would awaken Malone and provoke him to further violence. She waited until the next morning when Malone finally left. Thereafter, P.C. said she called her aunt in Michigan and asked her for a ride to a hospital.

The evidence shows that P.C. was examined in the emergency room of Elkhart General Hospital. The examining doctor testified from his records that he diagnosed P.C. as suffering from multiple contusions about the face, a tender right hand and a non-displaced fracture of the maxilla. No treatment or therapy was required, however. Since P.C. never mentioned to the doctor that she had been raped, no rape tests were conducted. P.C.'s aunt also testified that P.C. never said anything about having been raped. The aunt did affirm, however, that she drove P.C. and her sons to Elkhart General. P.C. swore out her affidavit on February 26, 1980, alleging Appellant's rape nearly four months after the purported attack. The Pre-Sentence Report included in the record specifically informs:

"While investigating Elkhart Police Department case # 85282 [the rape alleged by V.H.], police took a statement from Edward E. Harris, also known as Pee Wee Harris, who told them that Alonzo Malone had raped [P.C.] on October 30, 1979. Police contacted [P.C.] who told them that she had in fact been raped (sic) Alonzo Malone and that she was afraid of him as he had shot at her the week before with a .25 caliber automatic pistol. [P.C.] told police she would consider prosecuting Malone for the Rape. On February 18, 1980, [P.C.] advised police that she was willing to prosecute Malone for Rape and the case was filed as case # 86446 with the Elkhart City Police Department. [P.C.] told police that she had been beaten severely by Malone during the course of the Rape when Malone had broken into her home...."

The defense presented evidence that Malone and P.C. had been seen together in public sometime before July 4, 1979. Malone personally testified that he visited with P.C. about four times a week from June through October, 1979. He said they played cards, drank liquor and talked together. He claims they engaged in sexual relations four or five times at her apartment and six times at his. They first did so in July. Malone stated that he often gave candy and other food to P.C.'s children.

Malone's story continues as follows. Malone testified that on October 29th, he went alone from a friend's house to P.C.'s apartment with a half-pint of gin liquor and some candy for P.C.'s children. P.C. let him in her door just as some guests were leaving. She was drinking and appeared to be intoxicated. After the elapse of one half-hour, Malone noticed his gin was gone from the table he had set it on. He asked P.C. where it was. P.C. got mad, slapped Malone in the face and told him to leave as she tried to hit him with a water bottle. Malone grabbed her arm to prevent her from hitting him while he attempted to leave. P.C. grabbed another large bottle and hit Malone on his head with it. Malone then

slapped P.C. in the face a couple of times. Malone testified that although he slapped P.C. fairly hard, he did not hit her with his closed fist and he did not knock her to the floor. P.C. tried to hit Malone with a tire bat tool but Malone grabbed the bat from her and threw it. He ran out the door. Malone testified that he never threw P.C.'s keys.

Malone further testified that he subsequently returned to P.C.'s apartment with Jimmie Moton, his cousin and friend. Malone said he wanted to apologize to P.C. for their earlier fight. After talking together, P.C. told Malone and Moton they both could spend the night, whereupon Moton left. As Malone sat on P.C.'s bed, P.C. moved on top of him and pulled off both his clothing and her own. Malone testified that P.C. willingly had sexual intercourse with him two times. Afterwards, Malone fell asleep. Malone testified that when he awoke in the morning, he helped P.C. wash her dishes and clean her apartment since she was complaining about a pain in her arm. Malone further testified that he gave P.C. a dime to call her mother and then watched her children and prepared sandwiches while P.C. was driven by her mother to the hospital.

Jimmie Moton's testimony substantiated Malone's claim that they went together to P.C.'s apartment with some liquor during the evening of October 29th. Moton also agreed that P.C. let them into her home. He testified that although P.C. was angry at first and argued with Malone, she eventually calmed down and said they both could spend the night with her. Moton further testified that he had not previously told the police the truth about his visit to P.C.'s apartment because he feared the police would accuse him of a crime he had not committed.

In addition to the conflicting testimony pertaining to the particulars of Malone's alleged rape of P.C., the record contains conflicting testimony over certain events subsequent to Malone's arrest. This evidence is significant as it is relevant to the issue of P.C.'s credibility. Mattie Malone, mother of Appellant and his thirteen siblings, testified as follows to a conversation she initiated with P.C. outside P.C.'s residence:

> "I asked her did she tell a lady that she would drop the charges if I gave her money and she told me yes. She said let me talk to my fiance and she went in to go back in the house and I begged for him to come out to the car....
>
> Then, I told her I said how much money would it take, and she never did say. She asked her boyfriend, and he said get the money."

Mrs. Malone further testified to a subsequent conversation she had with P.C. outside a mutual neighbor's house:

> "She said my lawyer told me not to say anything and I said whatever you say to me be confidential. I won't say nothing about it, and she said I did not tell them he raped me. I told them he injured my jaw bone, and I said thank you and I drove off."

In rebuttal, P.C. testified:

> "I was in my home and I kept hearing this car honking their horn, and so I looked out the window and and, you know, I thought maybe that it was somebody at the wrong house, so I went out and they rolled their window down and asked if I was [P.C.], and I said yes, I was, and Mrs. Malone, she had one of her daughters, I don't know her name, she had asked me, if you know, I would consider dropping charges if they were willing to pay me some money, and I didn't really want to talk to them and that, you know, I said that my boyfriend could talk to them, and then he came out and I told him to find out what they were doing because I was going to call my lawyer because I said, you know, they can't be going around doing this, so he talked to them briefly. I went back into my house, so I really couldn't say what was said, but he came back in, Michael did and told me she was willing to pay up to $500.00 and so then it was a couple days later, I believe, I called your office and I said something either to you or to one of the detectives about, you know, being offered money.

. . . . .

Well, since Alonzo has been in jail, I had one incident with his girlfriend, [M.B.] running up behind me with a knife and tried to kick me and stab me with the knife, so I called the police right away and they told me there was nothing they could do.

. . . . .

Well, I've been approached, you know, concerning money and stuff and they've [members of the Malone family] just been saying things like you know, that Alonzo didn't do this to you, you know, he didn't rape you, and they frightened me, you know, to the point where I don't want to leave my house anymore because it seems like, you know, I go to walk down the street and I'll be approached by one of them."

Following the State's offer to prove and despite Appellant Malone's rigorous objection, the State was permitted to call V.H. to testify about Malone's involvement in another alleged rape. The alleged rape involving V.H. purportedly took place over six weeks after the rape involving P.C. Subsequent to being convicted of the rape of P.C., Appellant was tried by a jury and acquitted of the rape V.H. alleged.

V.H. testified to the following. On December 14, 1979, V.H. was living in a sleeping room at the Frontier Inn Motel in Elkhart. The evidence shows that the Frontier Motel was located in the same vicinity of Elkhart where Malone and P.C. resided at that time. When V.H. arrived at the Frontier in the evening of the 14th, she found Malone and four or five other people in the lobby. V.H. testified that this was the first time she ever had seen Malone in her life. V.H. said she stayed in the lobby and talked with Malone while waiting for her boyfriend, Bill, to return. Bill was one of the Motel's managers and apparently lived in the Motel also.

V.H. testified that she talked with Malone in the lobby for what may have been several hours. Besides talking about her conflicts with Bill, V.H. also discussed a court appearance she had to make the next day. Sometime during the evening V.H.

changed her pants. Some other time during the evening, Malone went out of the Motel building and bought a hamburger for V.H., which she ate in the lobby. She also accepted Malone's offer of some liquor and poured approximately one-half shot into a can of soft drink she had. She said, however, that she never drank any of the adulterated drink. During V.H.'s conversation with Malone, Pee Wee Harris appeared and interrupted Malone. V.H. testified that she told Malone she did not like Harris.

V.H. further testified that she told Malone and Harris she felt sick and had to go upstairs to use the bathroom. Instead, V.H. went upstairs to her room where she laid down and smoked a cigarette. Subsequently, she heard knocking on her door and voices which she recognized as those of Malone and Harris. The two went away but soon returned and tried to pick the lock on her door. V.H. said she held the door knob so that they could not get into her room. Malone and Harris went away again, but returned with a key which allowed them to open the door. V.H. slammed the door shut and started screaming at them to leave her alone. They argued at length through the door until V.H. said she was going to shoot them, whereupon they left. V.H. opened her door to beckon help only to discover Malone and Harris approaching again. She locked the door, climbed out the window onto the roof, and jumped to the pavement below which was within a courtyard adjacent to the Motel. Her escape was frustrated, however, because the only exit from the courtyard was wired closed. Glancing back at her window, she noticed Malone and Harris peering out at her. V.H. climbed up the fire escape only to discover the fire escape door without a handle to open it by. V.H. testified that she then climbed out on a ledge hanging over the street. Before she could jump to the street, however, she slipped and fell and hurt her back such that she could not move.

Malone and Harris subsequently approached V.H. and told her she was "crazy" for having run from them. Malone picked

V.H. up and said he would carry her to her room. Unable to carry V.H. up the fire escape, Malone kicked open the courtyard door and carried V.H. into the Motel's lobby where he set her down. After arguing for awhile, V.H. asked Malone and Harris to let her walk around to relieve her back pain. She testified that she thought she might attract a police officer while walking. Harris and Malone argued between themselves about whether or not they should allow V.H. to go outside. V.H. testified that when she interjected herself into their argument and addressed Harris by name, Harris left saying he wanted to "get out of the picture." Malone then agreed with V.H. to allow her to walk along Main Street. Once alone and outside, however, Malone pulled V.H. to an alley alongside the Motel. V.H. said she did not go willingly as Malone always had a grip on her. She also said that when she struggled and attempted to scream, Malone put his hand over her mouth and threatened to break her neck. After walking a short distance, Malone stated he was tired of walking and was taking V.H. to her room to "get some because he had not gone through all this trouble for nothing." V.H. said she argued and tried to "make deals" with Malone but he became adamant. When she tried to scream a second time, Malone again covered her mouth and threatened to hurt her. Malone took V.H. back inside the Motel and directed her to move up the stairs. V.H. said she convinced Malone to climb the stairs first under the pretense that by doing so, she could grab onto him if she suddenly felt faint. When Malone started up the stairs, however, V.H. attempted to run away. Instead she fell and was caught by Malone. V.H. said Malone dragged her back inside the Motel and up the stairs. After Malone and V.H. arrived in V.H.'s room, they continued to argue. V.H. testified that Malone subsequently struck her once on her chin with his fist. She further testified that Malone took off her slacks and had intercourse with her against her will. V.H. said she participated only because she was afraid Malone would hit her again or would fulfill one of his previously

made threats. After intercourse, Malone got up and went out of the room and into a bathroom. V.H. said that when Malone returned, he began "saying a bunch of weird things like he was going to take care of me and I was going to be his girlfriend and he was going to take me away from Bill." He then "passed out" while lying on top of V.H. on her bed. V.H. testified that she pulled herself out from under Malone and found someone who summoned the police.

Appellant Malone alleges that the trial court erred in denying his Motion in Limine and in permitting V.H. to testify about his alleged forcible rape of her. Malone specifically asserts that V.H.'s testimony was not relevant to any legitimate issue in this criminal action and was introduced by the State only to "bootstrap" its weak case by prejudicing him in the mind of the jury. We agree. Since this cause must be reversed and remanded for a new trial, we will address only Appellant's first issue which requires our reversal.

I

Indiana's general rule controlling the admission of evidence which shows or tends to show that an accused is guilty of other independent and distinct crimes from the crime charged is that such evidence is inadmissible. *Montgomery v. State,* (1980) Ind., 412 N.E.2d 793, 795, *reh. denied; Henderson v. State,* (1980) Ind., 403 N.E.2d 1088, 1090; *Randolph v. State,* (1977) 266 Ind. 179, 181, 361 N.E.2d 900, 901; *Maldonado v. State,* (1976) 265 Ind. 492, 495, 355 N.E.2d 843, 846; *Cobbs v. State,* (1975) 264 Ind. 60, 62, 338 N.E.2d 632, 633; *Burns v. State,* (1970) 255 Ind. 1, 7, 260 N.E.2d 559, 563. In different words, evidence which can prove or tend to prove that an accused engaged in criminal activity similar to the charged crime is generally inadmissible to prove an accused's propensity to commit crime or an accused's guilt of the charged crime. This rule is predicated upon our fundamental precept that every accused has the right to know the nature and cause of the accusation for which he is being prose-

cuted. To indiscriminately admit proof of criminal activity beyond that specifically charged may compel a defendant to meet accusations without notice and may effectively negate the due process presumption of innocence which our system of justice accords to every accused. Moreover, the admissibility of such evidence may raise collateral issues which confuse the jury or divert its attention from the actual charges before it. The admission of such evidence may also violate our evidentiary rules which forbid the State from attacking an accused's character before the accused has put his character into controversy and from proving an accused's bad character by showing particular bad acts. The general rule excludes evidence of other alleged criminal activity regardless of whether the activity was allegedly committed before or after the charged crime.

Despite the continued vitality of the general rule, there are certain exceptions to and limitations upon it. Evidence of other criminal activity may be admissible in certain cases to prove an accused's identity, knowledge, intent or motive, or to demonstrate the common plan or scheme of criminal activity from which the accused originated the charged crime. *Kimmel v. State,* (1981) Ind., 418 N.E.2d 1152, 1154, *cert. denied,* 454 U.S. 932, 102 S.Ct. 430, 70 L.Ed.2d 239; *Choctaw v. State,* (1979) Ind., 387 N.E.2d 1305, 1307. To be admissible according to any one of these exceptions, however, the evidence must possess substantial probative value. The test for admission is whether or not the evidence is so specifically and significantly related to the charged crime in time, place and circumstance as to be logically relevant to one of the particular excepted purposes. *Montgomery v. State,* 412 N.E.2d at 795; *Duvose v. State,* (1971) 257 Ind. 450, 451, 275 N.E.2d 536, 537. For instance, evidence of other criminal activity is commonly allowed to prove the identification of an accused according to the common plan or scheme exception. *Armstrong v. State,* (1982) Ind., 429 N.E.2d 647, 652; *Foust v. State,* (1981) Ind., 428 N.E.2d 776, 778; *Kimmel v. State,* 418 N.E.2d at 1154; *Williams v. State,*

(1981) Ind., 417 N.E.2d 328, 332; *Porter v. State,* (1979) Ind., 397 N.E.2d 269, 272; *Willis v. State,* (1978) 268 Ind. 269, 272, 374 N.E.2d 520, 522. The operative rationale is that if an accused is known to have committed a crime in a particularly distinct way, then that accused can probatively be considered as having committed another similar crime if the similar crime was also committed in the same particularly distinct way. In ruling upon the propriety of admitting evidence of other criminal activity according to the common plan exception, this Court requires a strong showing that the different criminal actions were so similarly conducted that the method of conduct can be considered akin to the accused's "signature." *Biggerstaff v. State,* (1977) 266 Ind. 148, 152, 361 N.E.2d 895, 897. The mere repitition of similar crimes is not enough to qualify for an exception to the general rule. *Williams v. State,* 417 N.E.2d at 332; *Willis v. State,* 268 Ind. at 272, 374 N.E.2d at 522. Notwithstanding, if the identification of an accused can be proved by other evidence or if an accused's identity is not a material issue, then the admission of evidence of other criminal activity is improper to establish identity. Of course, no evidence is admissible if it is not relevant to some material issue in a case.

There is no specific exception to the general rule prohibiting evidence of an accused's other criminal activity which makes such evidence admissible to prove a prosecutrix's lack of consent. In *Meeks v. State,* (1968) 249 Ind. 659, 234 N.E.2d 629, a witness' testimony that the defendant raped her prior to the rape for which the defendant was prosecuted was found by this Court to be inadmissible where the only issue in the case was whether or not the prosecutrix consented to the sexual intercourse. We held that evidence of the defendant's other criminal activity must be relevant to some point at issue to be admissible. Since consent was the only element at issue once the defendant admitted the intercourse, we specifically held that the other alleged rape was irrelevant and we reversed the rape conviction. Subsequent-

ly, we stated that *Meeks* stands for the principle that:

"... evidence of prior crimes is inadmissible in rape cases where the act charged has been proven or admitted and the only issue concerns the consent of the prosecutrix."

*Miller v. State,* (1982) Ind., 436 N.E.2d 1113, 1121; *Woods v. State,* (1968) 250 Ind. 132, 143, 235 N.E.2d 479, 486. Although we have distinguished *Meeks,* we have limited its authority only to those rape prosecutions in which the defendant raises consent as the sole defense. *Austin v. State,* (1974) 262 Ind. 529, 531, 319 N.E.2d 130, 132, *cert. denied,* (1975) 421 U.S. 1012, 95 S.Ct. 2417, 44 L.Ed.2d 680 (holding to the distinction between sodomy cases involving the "depraved sexual instinct" exception to the general rule of inadmissibility and rape cases); *Miller v. State,* (1971) 256 Ind. 296, 299, 268 N.E.2d 299, 301 (charges include sodomy); *Kerlin v. State,* (1970) 255 Ind. 420, 424, 265 N.E.2d 22, 25 (charges include sodomy). *Meeks* is still good law. The essence of our holding in *Meeks* is that:

"An individual on trial for a sexual offense should be afforded the same evidentiary safeguards against irrelevant prejudicial testimony as an individual on trial for another felony."

*Meeks v. State,* 249 Ind. at 664, 234 N.E.2d at 632. We now reaffirm *Meeks* as it applies to rape cases where consent is the only issue. The fact that one woman was raped has no tendency to prove that another woman did not consent. Accordingly, we find the evidence suggesting that Malone raped V.H. inadmissible to prove that P.C. did not consent to Malone's prior intercourse with her.

 Even if we were now to relax the rule of *Meeks,* the State has not convinced us that Malone's subsequent criminal activity was relevant to the material issue of P.C.'s consent to intercourse. The trial court allowed evidence of Malone's alleged rape of V.H. before the jury ruling:

"The identity of the individual is not a factor in either one of these cases. To the extent that it does tend to bear on

the issue of whether there's a common plan of (sic) scheme, a motive, the intent or the purpose, I believe that the evidence is sufficiently close in both cases to at least bear on that issue and to warrant itself admissible."

The test to bring evidence of other offenses within the common plan or scheme exception is not whether the other offenses have certain elements in common with the charged crime but whether the other offenses tend to establish a preconceived plan by which the charged crime was committed. The crimes must, therefore, be so related in character, time and place of commission as to establish some plan which embraced both the prior and subsequent criminal activity and the charged crime. Assuming that a common plan can be proven, evidence of the plan must nonetheless be relevant to a material issue to be admissible. As previously stated, evidence of a common plan is most commonly used to prove the identification of an accused. Identity was not a material issue in the instant case, however, as the trial court acknowledged. It is argued that because Malone allegedly directed coercive force against both P.C. and V.H., Malone operated according to a common plan to forcibly satisfy his sexual desires regardless of his victim's lack of consent. The State vaguely defines Malone's plan of abuse as follows:

"Malone attempted to be sociable but when rebuffed proceded (sic) to accomplish his purpose by force."

We find this statement of Malone's purported plan to be specious at best. The mere fact that force was allegedly exercised or threatened in spite of another on two separate occasions is not sufficient *per se* to constitute a plan which warrants an exception to the general rule of inadmissibility. If such a showing were sufficient, then the general rule would never be applicable in rape cases. Finding no common plan embracing both alleged rapes, we hold that the trial court erred in permitting V.H. to testify according to the common plan or scheme exception to the general rule. Further, we hold that these alleged rapes were too re-

mote from each other to justify the admission of V.H.'s testimony to prove Malone's motive, intent or purpose. P.C. and Malone had known each other for at least one month prior to the charged intercourse whereas V.H. had met Malone for the first time on the night of her alleged rape. P.C. had been Malone's friend. She had engaged in a continuing course of contacts with Malone which included many visits together in Malone's home and in her own. In sharp contrast, V.H. was little more than a stranger. She had met Malone for the first time in the public lobby of a motel just hours before the alleged rape. Finding such disparity between the character of Malone's relationship with P.C. and Malone's relationship with V.H., we hold that V.H.'s testimony must be excluded because of its remoteness and because its probative value is far outweighed by the undue prejudice it precipitates.

In the instant case, the only issue properly before the jury was whether or not Malone forcibly induced P.C. to engage in sexual intercourse without P.C.'s consent. In such a case with no eyewitnesses and with each party propounding a conflicting story, the relative credibility of the prosecutrix versus the defendant is likely to be the determinative factor with the jury. This is especially probable when the circumstantial evidence can clearly support either party's account. Under these conditions, the jury must be carefully protected from all irrelevant evidence which is offered solely to reflect unfavorably upon the defendant's general moral character. Malone admitted to the intercourse with P.C. but claimed her consent. P.C. claimed she did not consent but that Malone forced himself upon her. Since P.C.'s general veracity was challenged by the State's own independent witness, Oddie Honorable, we are led to conclude that the evidence before the jury was close if considered without the testimony of V.H. The evidence was even closer as the challenge to P.C.'s credibility was compounded by the fact that P.C. apparently never told anyone without prompting that she had been raped but possibly confessed to Malone's mother that she had not been raped.

V.H.'s testimony arguably tipped the balance against Malone as it severely prejudiced him before the jury. What the State hoped for and was allowed to present to the jury was the inference that if Malone raped V.H. as she testified, then he must have raped P.C. as charged because a man who commits one rape is presumably more likely to commit another. It appears that such improper evidence had its improper effect in this case. We therefore cannot permit this conviction to stand. The jury's determination of whether or not P.C. consented to Malone's advance must be made only through consideration of the evidence directly pertaining to the alleged forcible rape of P.C. Accordingly, the judgment of the trial court is hereby reversed and this cause is remanded for a new trial consistent with the dictates of this opinion.

GIVAN, C.J., and DeBRULER, HUNTER and PRENTICE, JJ., concur.