Bennett James **HOBBS** and Joseph
Hernandez, Appellants,

v.

**STATE** of Indiana, Appellee.

No. 1181S334.

Supreme Court of Indiana.

Aug. 17, 1984.

William S. Suarez, Portage, for appellants.

Linley E. Pearson, Atty. Gen., Louis E. Ransdell, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendants-Appellants Bennett James Hobbs and Joseph Hernandez were found guilty of murder by a jury in the Porter Superior Court on June 4, 1981. On June 29, 1981, the trial judge sentenced Hobbs to fifty years imprisonment and Hernandez to forty years. Appellants now directly appeal raising several issues for our review. Since we find that the trial court erred by admitting evidence of prior unrelated criminal activity by Appellants, we will consider only that issue in this opinion.

During the evening of January 6, 1981, Lloyd Stonewall ("Stoney") Faure was killed in the garage of his home in the Shorewood Forest housing development near Valparaiso, Indiana. Faure apparently was struck on his head by a large piece of firewood found near his body. The police concluded that he was murdered during the perpetration of a burglary since his house had been ransacked. The only evidence placing Appellants at the scene of this crime was State's witness Terry Keeler who testified that he assisted Appellants in burglarizing Faure's home. Keeler specifically testified that he was a "lookout" for Appellants who actually entered the house and perpetrated the burglary.

Prior to trial, Appellants learned that the State intended to present evidence of certain prior unrelated criminal activity and accordingly filed individual motions in limine with the trial court to prevent such presentation. During the subsequent suppression hearing, Prosecutor Berning made the following statement:

"MR. BERNING: I do intend to introduce evidence through Keeler and other witnesses that the Defendants are all part of a burglary ring that did burglaries together, that's how they knew each other. I intend to introduce that for a couple of reasons. Number one, the case I'd like to give to the Court which sets out the exceptions to the general rule that you cannot introduce evidence of prior offenses or prior acts of misconduct or whatever the wording is, the exception is if you can show common scheme or plan—I'll read the headnote. 'Although not admissible to show defendant's propensity of crime in general, evidence of prior crimes if relevant to some issue in the case, most commonly intent, motive, knowledge, plan or credibility.'

I submit to the Court that the evidence here of the Defendants' prior burglaries in this burglary ring goes towards the common scheme and plan and also goes towards credibility.

THE COURT: Goes to identity too?

MR. BERNING: Yes it tends to go towards identity also. I'm not going to introduce evidence that says I committed a crime with the Defendants, Hobbs or Hernandez, on such and such a night. What the witnesses are going to say are who members of the burglary ring are, who was the head of it, who set up the burglaries, where the stolen property was fenced after ripped off from the houses. It's all going to show common scheme or plan, also really important for credibility. It's going to show that when Keeler gives his statement about the burglary ring, he's telling the truth; when Defendants were arrested and denying knowing each other, goes to lying, goes to credibility not only of our witnesses but the Defendants."

The trial court denied the motions in limine insofar as they pertained to the prior crimes evidence. The prosecutor again stated in his opening statements to the jury that he was going to submit evidence of prior unrelated crimes which would be "admissible to show intent, motive, [and] method of operation." He also told the jury that the evidence would be admissible to establish the credibility of certain witnesses.

The trial transcript shows that Detective Robert Weeks of the Porter County Sher-

iff's Department testified that he talked to Terry Keeler in connection with his investigation of the Faure homicide. Weeks stated that Keeler claimed to know Jim Hobbs and Joe Hernandez "because of prior involvement in burglaries in Lake and Porter counties." Defense Counsel at that point requested a mistrial because Weeks had not "connected up unique characteristics that must be as required by law." The State responded: "I believe the evidence, once it all comes in, will show a connection to method of operation, identification and, more particularly, credibility." The trial court overruled the objection but advised Appellants that if they later believed that the State had failed to "link [this evidence] up concerning credibility, identity, [and] motive," then they could move to strike the testimony and the trial court would be in a better position to rule at that time. Appellants requested the trial court to instruct the jury on how to receive this evidence but the court refused to do so at that time indicating that it would do so in final instructions. Keeler subsequently was allowed to testify.

Keeler testified at length during Appellants' trial about his participation in a burglary ring to which both Appellants allegedly belonged. Specifically, Keeler testified that he had committed eight burglaries with the ring including three or four with Hobbs and three with Hernandez. Keeler also testified that there were fifteen to twenty persons involved in the ring run by Nick Karlos, the "Greek", and his two subordinates, David King and "Fat George." King and "Fat George" each had five or six crews of two to six individuals apiece working under them who would actually commit the burglaries. Keeler specifically testified about how the ring typically committed its burglaries. He indicated that a "spotter" would be paid to pass information to Karlos suggesting that a particular house, including a friend's home, be burglarized because of certain valuables possessed inside. A "trouble-shooter" would be dispatched to view the prospective crime scene a day or two before the planned burglary to discover possible entrances and getaway routes. On the day of the burglary, one or two "lookouts" would drive one of the ring's vehicles to the entrance of the target housing development or site to monitor police activity in the area. The organization possessed approximately fifteen vehicles, each equipped with a police band radio receiver, a citizen band (CB) transceiver and a "kill switch." The "lookout" was to watch for police and to maintain CB contact with the inside operatives to advise them about any police activity. If police did approach, the "lookout" was to use the "kill switch" to stall his vehicle in the middle of the street thereby blocking any police vehicles and allowing the burglars to escape in their vehicle. Keeler also testified that the inside operatives were to wear surgical gloves so as not to leave any fingerprints at a crime scene. All members of the ring were to have pre-arranged alibis and were to deny knowing any of the others if caught. Keeler testified that Karlos was generally known to be a dealer in stolen merchandise and would identify exactly what property he wanted from each house before each burglary. Any other property stolen could be kept by the burglars for sale to Karlos or to some other "fence." Karlos maintained four locations for the receipt of stolen property including the coin shop where he worked. Keeler also testified that in the summer of 1980, he drove with Hobbs to Kentucky to deliver three crates of stolen guns belonging to Karlos. He made similar trips with Hobbs and for Karlos in August and October, 1980. Karlos paid him a total of $300 for the three trips.

Keeler testified at length about the Faure burglary which allegedly involved Appellants. He specifically testified that he, Randy Freeman, Appellant Hobbs and Appellant Hernandez met on January 6, 1981, in a Lake County bar to prepare for the Faure burglary. Keeler stated that Appellants left together in a green pickup truck while he and Freeman waited before leaving in a black and white Chevrolet automobile belonging to the ring. At about 6:00 that evening, Freeman and Keel-

er parked at the entrance to the Shorewood Forest development and waited presuming that Appellants were then perpetrating a burglary on the Faure home. After not hearing anything, they drove toward the Faure house and stopped where they could see what was going on. Keeler testified that after Freeman ascertained that Appellants were in Faure's home, they returned to their station at the entrance of Shorewood Forest and waited. Again not hearing or seeing anything, they drove to the Faure house and parked their car by the driveway entrance. Keeler got out of the car and proceeded partially down the driveway where he saw Hobbs sitting in the green pickup truck. He also saw Hernandez run out of the house, throw something into the bed of the truck and yell: "Let's get the * * * * out of here." Keeler then returned to his car and backed it up to allow the truck to go ahead of him since he was to stay behind the truck and use the "kill switch" to deter any police pursuit. Keeler said that he was concerned the police might be coming but he gave no reason for his fear. Keeler followed the pickup out of the Shorewood development to Highway 30 where he turned west and proceeded to a residence in Hobart while the pickup turned east. Although Keeler testified that his police scanner was on, he never stated that he heard any reports on it. At no time did he state that he was in contact with the burglars on the CB as he had testified their *modus operandi* contemplated. As a matter of fact, Keeler and Freeman twice approached the residence to discover what was happening there and to attempt to contact Appellants. Keeler did not indicate that there was any interfering CB radio traffic or that he even attempted to reach Appellants by CB as he previously stated they were prone to do. There was no testimony that surgical gloves or prearranged alibis were used.

The State was permitted, over objection, to call five additional witnesses to testify about their involvement in hundreds of burglaries in Lake and Porter counties. None of these witnesses, however, named the specific time or location of a burglary to support Keeler's testimony about the operation of Karlos' burglary ring. All of these witnesses were in jail at the time of trial. Thomas Waddell was one of these witnesses and testified that he had committed approximately one hundred burglaries for Karlos including "quite a few" with David King. He said that twelve to fifteen people were working for Karlos during the period of his involvement with Karlos and that the only instructions he ever received were to wear gloves and to deny knowing anyone else connected with the burglary. He testified that he committed two burglaries with Hernandez while working for Karlos but did not remember when or where those burglaries were committed. He stated that "Keeler" was just a name to him and that he had never committed a burglary with Keeler. He stated that he wore brown gloves during a burglary and that the stolen property was taken to King's home and then to Karlos'. He also had transported stolen guns to Kentucky for Karlos. At the close of Waddell's cross-examination by Hobbs, trial counsel for Hernandez moved to strike his testimony since the State "did not ask him time, place or anything regarding Hernandez." The trial court overruled the motion stating that although the testimony did not go to prove any particular burglary, it could be used to support Keeler's testimony about the existence of a burglary ring.

David King testified that he knew Nick Karlos but had committed only one of his two hundred to two hundred and fifty most recent burglaries for Karlos. He did not know a "Fat George" and had no idea how many men, if any, Karlos had working for him. He did not know of any garages where Karlos kept stolen property although he knew that Karlos was a "fence" who dealt in stolen property since he sometimes sold stolen property to Karlos. He said that he did not belong to any organization run by Karlos but had his own of six men including Waddell. He testified that when he and his associates committed a burglary, he would wait until dark before driving around. If he saw a house without

lights on, he would have someone walk up to the door and knock. If there was no answer, he would park the car a block or two away and return to the house on foot. One person would act as a "lookout" while the others would go into different rooms in the residence looking for items to steal. He wore brown gloves during burglaries. At the close of King's testimony on direct, Appellants moved to strike his testimony claiming that it was not relevant or material to this case or to the burglary ring theory propounded by the State. Appellants claimed that the evidence regarding burglary rings only prejudiced and inflamed the jury. The trial judge denied the motions, however, stating:

"If you feel it isn't relevant or isn't material, then I don't know how it can hurt you to have the evidence in. If it has a little bit, it's up to the jury what weight, if any, that it would have instead of the Court having to weigh evidence."

Appellants also moved for a mistrial which was denied.

█ It is well established that evidence of other criminal activity by a defendant is highly prejudicial and generally inadmissible. Evidence of other unrelated criminal activity may be admissible in certain cases, however, to prove an accused's identification, knowledge, intent or motive or to demonstrate a common plan or scheme of criminal activity from which the accused originated the charged crime. This testimony must possess substantial probative value and must be so specifically and significantly related to the charged crime in time, place and circumstance as to be logically relevant to one of these particular accepted purposes. *Malone v. State,* (1982) Ind., 441 N.E.2d 1339; *Williams v. State,* (1981) Ind., 417 N.E.2d 328; *Willis v. State,* (1978) 268 Ind. 269, 374 N.E.2d 520; *Biggerstaff v. State,* (1977) 266 Ind. 148, 361 N.E.2d 895. This Court has held:

"[The common scheme or plan] exception requires much more than mere repetition of similar crimes; 'The device used must be so unusual and distinctive as to be like a signature' "

*Biggerstaff v. State,* (1977) 266 Ind. at 152, 361 N.E.2d at 897 (quoting *Riddle v. State,* (1976) 264 Ind. 587, 597, 348 N.E.2d 635, 641; C. McCormick, *Evidence* § 190 at 449 (2d ed. 1972)). In *Malone,* we held that evidence of other crimes must be relevant to some point in issue to be admissible. We also reaffirmed our holding in *Meeks v. State,* (1968) 249 Ind. 659, 234 N.E.2d 629, that when identity is not at issue in a rape case, and when consent is the only issue, the admission of testimony regarding another rape is prejudicial and not admissible.

█ The State now contends that since Keeler testified about a particular and unique method of committing burglaries with Karlos' burglary ring, his testimony about Appellants and their unrelated burglaries was proper to show common scheme, plan and mode of operation. We find, however, that the evidence presented in this case about prior unrelated crimes did not qualify for an exception to the general rule because it did not tend to show a common plan or scheme. Although Keeler testified generally that Karlos' plan was used in the Faure burglary, he did not directly testify about which specific "signature" practices were utilized. For instance, there was no testimony that Appellants used surgical gloves and, as a matter of fact, police officers testified that there were a number of smeared or overlaid fingerprints present at the crime scene. The State also claims that the evidence was admissible to identify Appellants as the perpetrators of this crime. We note that there was no question of identity in this case since Keeler testified on direct that he was at the scene with Hobbs and Hernandez. The State further claims that it was proper for Keeler to testify that he had committed other burglaries with Appellants to support his testimony that he knew Hobbs and Hernandez. As we already have stated, Keeler testified that he was with Appellants at the crime scene. The record also indicates that at least five other witnesses, including Keeler's father, testified that they had seen Keeler together with Hobbs and Hernandez at various times and places before the Faure burgla-

ry. Accordingly, we are left only with the serious question of a large amount of testimony regarding Appellants' prior criminal activities admitted for the sole purpose of supporting Keeler's credibility. In the first instance, we do not interpret any of our prior holdings to support the State's proposition that prior unrelated crimes can be admissible solely to support the credibility of a witness. Secondly, we observe that an analysis of Keeler's testimony raises grave doubts as to whether the prior crimes evidence even bolstered Keeler's credibility. The only testimony about a burglary ring with Karlos at the top and using a certain *modus operandi* came from Keeler. No other witness testified to this structure or common scheme or plan. Keeler himself only generally said that he committed eight robberies by this plan and that Appellants were involved in three or four of these. Keeler did not testify about any specific burglaries in which he and Appellants were involved other than the instant burglary. Even if we assume *arguendo* that Keeler's testimony was supportive of the State's common plan theory, the testimony of the other witnesses regarding unrelated crimes did not so qualify. The only thing to be said of all of this testimony is that Keeler, Karlos, Hobbs, Hernandez, King, Waddell and others were burglars. The witnesses do not corroborate Keeler or each other that there existed some common scheme or plan which tends to prove that Appellants committed the instant crimes. Not one of the witnesses testified about another crime that had the same "signature" as this one and all only generally testified that these persons were prone to commit burglaries, sometimes in the company of each other. This is not sufficient to be admissible. *Malone, supra; Williams, supra; Willis, supra; Biggerstaff, supra.*

■ We now find that the only reason given for the admission of Keeler's testimony about Karlos' burglary ring was that it tended to support the credibility of Keeler's testimony that he knew Appellants because he had committed other crimes with them. Five other witnesses testified, however, that Keeler knew Appellants. Evidence as

highly prejudicial as Keeler's testimony about the operation of Karlos' burglary ring cannot be justified merely on the grounds that it tended to support his credibility as a witness. The evidence would be admissible if it was probative to show a common scheme or plan relating this instant crime to others testified about. This it did not do. No one testified that the crimes were committed in vehicles owned by the ring and equipped with a police scanner and CB radio. No one testified that "spotters" or "troubleshooters" went out to consider a burglary at the Faure home. No one testified that there was a general plan for the disposition of Faure's property after it was stolen. There was evidence that Karlos was a "fence," but this can hardly be considered a common scheme. The only testimony which tied Appellants to the Faure murder was Keeler's. The admission of the testimony about other unrelated criminal activity was highly prejudicial and the trial court committed reversible error by admitting it.

The judgment of the trial court is reversed and a new trial is ordered for both Appellants.

GIVAN, C.J., and HUNTER, DeBRULER and PRENTICE, JJ., concur.