Clark Jeffery JENKINS, Appellant,

v.

STATE of Indiana, Appellee.

No. 1283S434.

Supreme Court of Indiana.

Feb. 19, 1985.

Rehearing Denied April 24, 1985.

Anthony V. Luber, South Bend, for appellant.

Linley E. Pearson, Atty. Gen., Phillip B. Rarick, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-Appellant Clark Jeffery Jenkins was found guilty of Rape, a class A felony, and Robbery, a class B felony, by a jury in the St. Joseph Circuit Court on April 27, 1983. On June 1, 1983, the Honorable Jeanne J. Swartz sentenced Appellant to the Department of Corrections for a period of thirty (30) years for the rape conviction and a period of ten (10) years for the robbery conviction. The sentences were ordered to be served consecutively. Appellant now directly appeals and raises the following five issues:

1. the trial court erred by declaring the first trial a mistrial;

2. the trial court erred by denying Appellant's motion to admit evidence under the Rape Shield Law;

3. the trial court erred by admitting certain testimony;

4. insufficiency of evidence; and

5. the trial court erred by imposing consecutive sentences for the rape and robbery convictions.

Appellant Clark Jenkins was first tried on July 6, 1982. The case was submitted to the jury at 11:27 a.m., July 8, 1982. At 3:18 p.m. the court called the jury back in to determine the status of their deliberations. When the court polled the jurors, they unanimously agreed that they were deadlocked and that even another day of deliberation could not change this situation. The trial court then declared a mistrial.

Appellant's second trial began April 27, 1983. D.B., the prosecutrix, was thirty-two (32) years old and married when the alleged crimes were committed on August 25, 1981. She lived in California but had travelled alone and was visiting her parents in South Bend, Indiana. D.B. testified that on August 25, 1981 she was alone and asleep in her mother's house when the lights in the bedroom were switched on. She awoke to a man with a long butcher knife standing in the bedroom doorway. He lunged at her with repeated profanity and threatened to cut her head off. D.B. screamed for help. Appellant responded by ripping the telephone cord from the wall, gathering sheets, stuffing them in D.B.'s mouth and threatening to kill her if she did not remain quiet.

D.B. further stated that Appellant threatened again to kill her if she did not tell him where there was money. When she failed to do so, he pulled her nightgown up and put the knife between her legs and threatened to cut her if she did not tell him where to find money. D.B. further testified that at this time she could hear at least two other unfamiliar voices outside the bedroom. Appellant informed D.B. that he intended to rape her. She pleaded with him but to no avail and Appellant, by knife point, forced D.B. to perform oral sex upon him and then forced her to have vaginal intercourse.

D.B. stated that after the rape Appellant demanded D.B. to tell him of any valuables in the house. D.B. told him her purse was in the kitchen to which he responded it had already been examined. Finally, D.B. told him there was a Cadillac in the garage with the keys in it. Appellant departed out the back door yelling, "Don't call the police for half an hour." D.B. immediately locked the back door. She secured a sharp knife which she brandished in the window when she heard someone at the back door again. Moments later she saw someone get into the Cadillac and drive away. The Cadillac, a television set and a cuckoo clock were taken. D.B., still in her nightgown, ran barefoot to the neighbor's house and immediately called the police. She was then taken to the hospital where a rape kit test was performed.

Appellant, age 29, testified on his own behalf. He admitted having sexual intercourse with D.B. the night of the alleged crimes, August 25, 1981, but claimed D.B. consented to it. His version of the facts is as follows. Appellant testified that he met D.B. in the early summer months of 1981 at a bar. Her mother was with her. Since Appellant knew D.B.'s mother he stopped to talk with her and in the meantime was introduced to D.B. Appellant visited the home of D.B.'s mother again in July where he encountered D.B. for the second time. D.B.'s mother was not home but D.B. and Appellant conversed inside the house awhile then drove together to her father's house to pick up some mail. The next time

Appellant saw D.B. was August 25, 1981, the night of the crimes. Appellant went to the home of D.B.'s mother and talked with D.B. When D.B. said she had to leave but that she would be back later, Appellant said he would be over that evening. When he returned he had two male friends with him. Appellant, his friends, and D.B. sat in the backyard and all drank beer and shared one marijuana cigarette. After awhile Appellant and D.B. went into the house. Appellant's friends were making their way towards their car at that point. Appellant and D.B. talked inside the house and decided during the conversation to have sex. So D.B. went into another room and changed into a nightgown. Appellant claimed he did not have a knife during intercourse and that they both had agreed to engage in the act. Afterwards he heard someone walking through the house. Thinking it was D.B.'s mother he investigated and found his friends in the kitchen going through D.B.'s purse. Appellant inquired as to his friends' presence. Meanwhile D.B. heard talking and began screaming at Appellant's friends when she realized they were robbing her. The television set had already been removed. After Appellant's friends left and D.B. threatened to call the police, Appellant persuaded her he would get the items back. Appellant left on foot and as he was walking one of Appellant's friends drove up in the car D.B. usually drove. Appellant got in and asked his friend to return the car and items taken from D.B. His friend refused and said he intended to "strip" the car. Appellant admitted being present when the car was "stripped" but did not receive any of the property or know what happened to it.

On rebuttal the testimony of one C.K., which was ruled inadmissible in the State's case-in-chief, was admitted. C.K., testified that more than a month after D.B.'s rape a man she identified as Appellant came into her home with a gun. He took a television set and money. He also forced her to engage in oral and vaginal intercourse. Fingerprints from the house were identified as belonging to Appellant.

Appellant alleges that the trial court erred by admitting evidence of a subsequent alleged rape when consent, not identity, was the only material issue in dispute. Appellant contends that this evidence was so prejudicial that he is entitled to a new trial. We agree. Since this cause must be reversed and remanded for a new trial, we will address only the issue which requires reversal.

## I

The sole issue at trial regarding the rape charge was whether D.B. consented to Appellant's actions. There is no identification issue. There is no question that Appellant and D.B. engaged in sexual intercourse. The problem is whether Appellant entered D.B.'s home without her permission and forced her to have sexual relations against her will. Both Appellant and D.B. presented contradictory stories about what transpired between them.

During the State's case-in-chief, C.K., the victim of the subsequent alleged rape, was called to testify. Appellant's counsel, Attorney Thistlethwaite objected and the record discloses the following proceedings:

"Mr. Thistlethwaite: I have an objection I want to raise on the record before she testifies. I believe I know the nature of her testimony.

"The Court: Well, what is your objection?

"Mr. Thistlethwaite: I don't know if you want to excuse the jury or not?

"The Court: Well, can you state it? Is it going to be a long-standing objection? Is that what you're telling me?

"Mr. Thistlethwaite: Briefly, I think what her testimony involves are similar acts, and I don't believe the testimony is admissible at this point in the trial, number one, and I don't believe it's admissible period. So I want to place an objection on that ground.

"The Court: All right. I will excuse them."

Record at 593.

After the jury was excused the State said C.K. was a similar acts witness. After both sides presented argument, the court sustained the objection.

As part of its rebuttal, the State again called C.K. The previous objection was renewed and the following discussion took place:

"Mr. Thistlethwaite: I want to make sure the record reflects the continuing objection to the testimony of this witness.

"The Court: Is this witness' testimony going to have anything to do with the Defendant taking the T.V. and/or money from her purse?

"Miss Becker: It will have both of those things; in addition, Judge, this witness will also testify that the Defendant told her, 'Don't try to get me for rape. I'll say you enjoyed every minute of it.' I think it also mentions on that, the fact that this man rapes women and then he later tries to say it's consent. It's exactly the same thing that he told her he would do, and in addition, it will tie up the other issues in this case that the robbery is similar; the robbery of the purse, the T.V., and the fact there were other individuals working and that the Defendant was actually the boss.

"The Court: Particularly, what I want to know, did he simply take the money from the purse or is there going to be a discussion wanting money and getting property and getting it from her purse?

"Miss Becker: They did have some conversation about taking money, but the purse was in the room where she was or it was in a living room and he entered the living room at this point. Judge, I can check. I don't remember what the conversation was.

"The Court: Check it before we go forward.

"Miss Becker: Judge, we can't come up with it exactly. What she told me was that the purse was there. He took the money. He took the money out of her purse and he took the T.V. As far as other things tying up, I still think it would come under 'Common Scheme.' I

also think it's very important for the fact that, you know, he said—he told her that. 'I'll just say you enjoyed it. I'm going to say there's consent in this case.' Exactly what he's trying to do in the case of [D.B.], the case at hand. I think that in addition the television was taken and also, Judge, he took something which I failed to mention yesterday. When the Defendant gave the statement to Bill Wells he said exactly the same thing about this house where [C.K.] lives. He said that he broke in there and he took a T.V. and he didn't mention anything about intercourse with the woman or anything else. As I said in [D.B.'s] case he said, 'I borke [sic] in there and took the T.V.' That's the same thing about [C.K.'s] case. He said it in both cases. He's made the comment there was consent or that he would say there was. In addition to what I said yesterday, those are both houses, as I said, in the same neighborhood, the houses are on the first story. He broke in to [sic] the houses— both of these houses are women who live alone. In the case of [D.B.] she was visiting but it happened at a time she was alone. He had told both he had been watching them for a long period of time.

"The Court: Okay. The witness will be permitted to testify over the objection of the Defendant."

Record at 665.

C.K. testified that a month or longer after D.B.'s rape a man entered her home with a gun. At trial she identified the intruder as Appellant. She testified Appellant took a television and money and forced her to have oral sex and intercourse. Also, fingerprints from her house were identified as belonging to Appellant.

At trial the prosecutor argued in support of the admission of C.K.'s testimony that it would tend to show D.B. did not consent because Appellant claimed in the second rape he would defend any allegations of rape with the claim that C.K. consented. The prosecutor wanted to show a pattern that "this man rapes women and then he later tries to say it's consent." Record at 665.

Indiana's general rule regarding the admission of evidence which shows or tends to show an accused is guilty of other independent and distinct crimes from the crime charged is that such evidence is inadmissible. *Hobbs v. State,* (1984) Ind., 466 N.E.2d 729; *Watkins v. State,* (1984) Ind., 460 N.E.2d 514; *Lambert v. State,* (1983) Ind., 448 N.E.2d 288. However, evidence of other criminal activity may be admissible in certain cases to prove an accused's identity, knowledge, intent or motive, or to demonstrate a common scheme or plan. *Watkins, supra; Hill v. State,* (1983) Ind., 445 N.E.2d 994; *Lambert, supra.* There is no specific exception to the general rule prohibiting evidence of an accused's other criminal activity which makes such evidence admissible to prove a prosecutrix's lack of consent. *Brown v. State,* (1984) Ind., 459 N.E.2d 376; *Miller v. State,* (1982) Ind., 436 N.E.2d 1113; *Malone v. State,* (1982) Ind., 441 N.E.2d 1339.

To the extent that C.K.'s testimony related her rape experience, her testimony was inadmissible because it was admitted to prove D.B.'s lack of consent under the common scheme or plan exception. In *Malone, supra,* the material issue in dispute at trial was whether the prosecutrix consented to sex with the appellant. We reversed on the basis that testimony regarding a subsequent alleged rape by Appellant was admitted to prove lack of consent under the common scheme or plan exception. The following excerpt from *Malone* parallels and applies to the case before us:

"In the instant case, the only issue before the jury was . . . consent. In such a case with no eyewitnesses and with each party propounding a conflicting story, the relative credibility of the prosecutrix versus the defendant is likely to be the determinative factor with the jury. This is especially probable when the circumstantial evidence can clearly support either party's account. Under these conditions, the jury must be carefully protected from all irrelevant evidence which is

offered solely to reflect unfavorably upon defendant's general moral character." *Malone,* Ind., 441 N.E.2d at 1348. For the same reasons propounded in *Malone,* we must find that in the case before us C.K.'s testimony regarding the subsequent rape was inadmissible.

 The State further alleges that C.K.'s testimony regarding the subsequent rape was admissible under the depraved sexual instinct exception. While it is the general rule in Indiana that evidence of separate, independent and distinct crimes to establish the guilt of an accused is inadmissible except to show intent, motive, purpose, identification or common scheme or plan, we have carved out an exception to that rule as to those acts involving or demonstrating a depraved sexual instinct. *Follrad v. State,* (1983) Ind., 451 N.E.2d 635; *Wells v. State,* (1982) Ind., 441 N.E.2d 458, *reh. denied; Grey v. State,* (1980) 273 Ind. 439, 404 N.E.2d 1348. Although most Indiana cases involving the depraved sexual instinct exception involve sodomy or incest, and both D.B. and C.K. testified Appellant forced them to engage in sodomy *by oral copulation,* we disagree that C.K.'s testimony was admissible under the depraved sexual instinct exception. *Howell v. State,* (1980) 274 Ind. 490, 413 N.E.2d 225, *reh. denied; Daniels v. State,* (1980) 274 Ind. 29, 408 N.E.2d 1244; *Miller v. State,* (1971) 256 Ind. 296, 268 N.E.2d 299 (sodomy *by oral copulation* ).

In *Malone,* we reaffirmed *Meeks v. State,* (1968) 249 Ind. 659, 234 N.E.2d 629 as it applies to rape cases where consent is the only issue, and in doing so reiterated, "The fact that one woman was raped has no tendency to prove that another woman did not consent." *Malone,* Ind., 441 N.E.2d at 1347. Both *Meeks* and *Malone* held that since consent was the only issue, once defendant admitted intercourse, the other alleged rape was irrelevant. We reversed both *Meeks* and *Malone* on this basis. *Meeks,* in addressing the depraved sexual instinct exception, rejected the rule that if an individual is on trial for a crime involving abnormal sexual intercourse, evidence of other improper acts of sexual intimacy are always admissible. *Meeks* held instead that, "an individual on trial for a sexual offense should be afforded the same evidentiary safeguards against irrelevant prejudicial testimony as an individual on trial for another felony." *Meeks,* 249 Ind. at 664, 234 N.E.2d at 632. In accord with the holding in *Meeks* and *Malone* we find that the State's argument that C.K.'s testimony was admissible under the deviate sexual instinct exception misguided. The State attempted to use this exception to prove D.B.'s lack of consent; however, Appellant's abnormal sexual intercourse with C.K. is irrelevant to the only element at issue in the case at bar, whether D.B. consented to intercourse with the appellant. Furthermore, the evidence was so highly prejudicial that reversal is clearly warranted.

Judgment is reversed with instructions that a new trial be granted, and for further proceedings not inconsistent with this opinion.

GIVAN, C.J., and DeBRULER, HUNTER and PRENTICE, JJ., concur.