Thomas GIBBS, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 48S00–8703–CR–338.

Supreme Court of Indiana.

May 30, 1989.

William D. McCarty, Anderson, for appellant.

Linley E. Pearson, Atty. Gen., Louis E. Ransdell, Deputy Atty. Gen., Indianapolis, for appellee.

SHEPARD, Chief Justice.

Appellant Thomas Gibbs stood trial for nineteen burglaries. The deputy prosecutor filed five witness lists with 116 names; the longest witness list had no addresses. He resisted giving further information. He provided addresses only on the morning of trial. Even then he refused to inform the defense which witnesses had information about which offense. It turned out that most of the witnesses had no information about the crimes being tried. The deputy prosecutor called them anyway—66 of them testified over a period of fifteen days, producing more than 3,000 pages of transcript. Sixty-five of the 66 could not identify the defendant.

Gibbs was found guilty by the jury of nineteen counts of burglary, a class B felony, Ind.Code § 35–43–2–1 (Burns 1985 Repl.), and nineteen counts of theft, a class D felony, Ind.Code § 35–43–4–2(a) (Burns 1985 Repl.). The jury also determined that Gibbs was an habitual offender. Ind.Code § 35–50–2–8 (Burns 1985 Repl.). We affirm four convictions and the habitual offender finding, penalties totaling 54 years, and order a new trial on the remaining counts.

At trial Debbie White testified that she began living with Gibbs in early 1983. During the course of the year, White said that Gibbs brought various items into the house. When a police investigation of a series of Anderson burglaries focused on Gibbs, he asked her to move the items out of the house. The police stopped White and her nephew as they drove away a truckload of the goods. White consented to a search of the truck and the house; the police found property from over fifty burglaries.

After presenting evidence on the charged crimes, the deputy prosecutor sought to bolster the State's case with evidence on the uncharged crimes. The trial court expressed skepticism about admitting the evidence but eventually acquiesced to the prosecutor's request.

Gibbs argues that the 39 uncharged burglaries should not have been admitted into evidence. He maintains the State never connected the uncharged crimes to him. The uncharged crimes, he claims, raised the possibility that the jury convicted him solely because of his bad character. The State responds that the evidence was admissible to prove identity, motive, and intent. The only issue at trial, however, was identity.

Our analysis proceeds in three parts. First, we will state the general rule on the admissibility of uncharged conduct and examine the exceptions to the rule. Second, we will consider the standard a trial court should use to judge whether the defendant committed the extrinsic offense. Third and finally, we will apply these rules and judge whether the probative value of the extrinsic evidence outweighs its prejudicial impact.

### I. Admissibility of Evidence on Extrinsic Offenses

Evidence concerning crimes extrinsic to the one for which a defendant is on

trial is generally inadmissible for three reasons. First, the government may not punish people for their character, and evidence of extrinsic offenses[1] poses the danger that the jury will convict the defendant because his "general character is bad or ... he has a tendency to commit certain crimes." *Williams v. State* (1986), Ind., 489 N.E.2d 53, 55. Second, indiscriminate admission of extrinsic offenses compels a defendant to meet accusations without notice. Third, extrinsic offenses raise collateral issues that confuse the jury and divert attention away from the charged crimes.

This Court has developed a number of exceptions to this general rule under the rubric "common scheme or plan." The exceptions allow admission of evidence on extrinsic offenses when necessary to promote some legitimate inference about a particular issue. Because the admission of extrinsic offenses can taint the fairness of the trial, the exceptions must be cautiously applied. *Penley v. State* (1987), Ind., 506 N.E.2d 806.

Our cases recognize two branches of the "common scheme or plan" exception. *Id.* at 809. The first branch permits proof of an extrinsic offense as evidence of a preconceived plan that includes the charged crime. In other words, the extrinsic offense is part of the *res gestae* of a larger criminal plan that included the charged offense. To be admissible under this branch of the exception, this Court requires that "[t]he crimes must ... be so related in character, time and place of commission as to establish some plan which embraced both the prior and subsequent criminal activity and the charged crime." *Malone v. State* (1982), Ind., 441 N.E.2d 1339, 1347.

The second branch allows for the admission of extrinsic offenses to prove intent, motive, purpose, or identity by showing the defendant committed other offenses with a similar *modus operandi*. *Penley*, 506 N.E.2d at 808–09.

This Court requires a lesser degree of similarity between the charged crime and the extrinsic offense when the evidence is introduced to prove state of mind than when it is introduced to prove identity. *See Williams v. State* (1985), Ind., 481 N.E.2d 1319. As long as the motive or intent is the same then the extrinsic offense is admissible, even if there are differences in the manner in which the two offenses are committed. For example, the government may prove that the defendant knew he was passing counterfeit securities by eliciting testimony that the defendant had knowingly purchased counterfeit currency on a prior occasion. *Peters v. United States*, 376 F.2d 839 (5th Cir.1967). Although the crimes were to some extent dissimilar, the extrinsic offense was relevant to establish the defendant's state of mind.

■ When an extrinsic offense is offered to prove identity, however, the *modus operandi* must be unusual and distinctive. Justice Pivarnik described the test to apply when an extrinsic offense is offered to prove identity: "[T]his Court requires a strong showing that the different criminal actions were so similarly conducted that the method of conduct can be considered akin to the accused's 'signature.'" *Malone*, 441 N.E.2d at 1346. The mere repetition of similar crimes is not enough to qualify for an exception to the general rule. *Id.* at 1346.

## II. *Evidence Connecting Defendant to Extrinsic Offenses*

■ Evidence of extrinsic offenses to prove identity is relevant only if the defendant in fact committed the extrinsic offenses. If the defendant is known to have committed an extrinsic offense with a unique *modus operandi*, then the extrinsic offense is admissible to prove the identity of a criminal who committed a charged crime with that same, unique *modus operandi*. Without evidence connecting the extrinsic offense to the defendant, such evi-

---

1. This Court has used many phrases to describe a defendant's other crimes, wrongs or acts that remain uncharged in the case under consideration. *E.g.*, *Williams v. State* (1986), Ind., 491 N.E.2d 540, 541 ("unrelated criminal activity");

*Kalady v. State* (1984), Ind., 462 N.E.2d 1299, 1306 ("prior bad acts"); *Malone v. State* (1982), Ind., 441 N.E.2d 1339, 1342 ("similar crime"). We choose to avoid these and other terms in favor of the term "extrinsic offenses."

dence would impugn the defendant's character without being probative of identity.

The necessity of proving the defendant committed the extrinsic offense is a threshold. It is preliminary to determining whether the evidence is probative of any issue in the case and whether its probative value outweighs its prejudicial effect.

The question turns on what standard a trial court should use to judge whether the defendant committed the extrinsic offense. Frequently, the State establishes the defendant committed the extrinsic offense through an eyewitness. *E.g., Bruce v. State* (1978), 268 Ind. 180, 375 N.E.2d 1042, *cert. denied*, 439 U.S. 988, 99 S.Ct. 586, 58 L.Ed.2d 662. This Court has also relied on circumstantial evidence to show that the defendant committed the extrinsic offenses. *See Foust v. State* (1981), Ind., 428 N.E.2d 776 (defendant brought into apartment television stolen during extrinsic offense).

■ Before making this threshold decision concerning evidence on the extrinsic offenses, Judge Spencer asked the prosecutor whether the State could connect Gibbs to the extrinsic burglary. The State connected Gibbs to the extrinsic burglaries through his girlfriend's testimony. She said Gibbs brought the stolen property from the extrinsic burglaries into the house. The probative value of this testimony, of course, was the same as that of her testimony concerning the charged offenses. This evidence was similar to the testimony approved in *Foust*. Judge Spencer properly found that White's testimony was sufficient to establish Gibbs as the perpetrator of the extrinsic burglaries.

### III. *Probative Value and Prejudice of Extrinsic Offenses*

Although the evidence sufficiently established that Gibbs committed the extrinsic offenses, the question remains as to whether the prosecutor made a strong enough showing of similarity required to admit the extrinsic offenses to prove identity. We must also judge whether the probative value of the extrinsic burglaries on the issue of identity outweighs its prejudicial impact on the defendant's character.

The State argues that the burglaries were committed with a markedly similar *modus operandi*. The State maintains that they all occurred in the early evening, with the point of entry in an obscure place, and with alternative escape routes. The perpetrator ransacked the bedrooms and took pillowcases. The State claims the extrinsic burglaries establish Gibbs' identity as the burglar and prove his motive and intent. Because Gibbs' defense was that he was not the burglar, we will only address the use of the extrinsic burglaries to prove identity.

*A. Charged Burglaries.* Because relating the facts of each charged burglary would be a substantial and unproductive undertaking, we select a few for comparison.

On March 19, 1983, between 8 p.m. and midnight, a burglar broke into Margaret Steger's home. The intruder entered by breaking the glass in the back door, reaching in, and unlocking the door. The burglar ransacked the bedroom and took a pillowcase. The record does not show that the thief opened other doors to create an alternative escape route.

On April 3, 1983, between 4 p.m. and 9 p.m., a burglar cut the glass in the back door of William Taylor's home to gain entry. He took a pillowcase and ransacked the bedroom.

On April 5, 1983, a burglar broke into Robert Scharnowske's residence. He forced open the front door, opened the porch door, and propped open the fence gates. The thief ransacked the bedroom but did not take a pillowcase.

On June 9, 1983, between 3 p.m. and 11 p.m., an intruder broke into Dennis Crabtree's home. The burglar used a screwdriver to remove the wood frame around a rear window and then took out the window. Mrs. Crabtree testified, "There were a few things ... thrown out of the drawers but [the house was] not ransacked." The burglar removed a television set but did not take a pillowcase.

These are the first four charged burglaries. Although they have some elements in common, they are not unique. The perpetrator of these four burglaries used four different means of entry: breaking glass to open the back door, cutting glass to open the back door, forcing open the front door, and removing a rear window. In two of these burglaries, the thief did not take a pillowcase. In some of the burglaries, the intruder did not ransack the bedrooms and did not provide alternative means of escape.

*B. Extrinsic Burglaries.* After the deputy prosecutor presented evidence on the nineteen charged burglaries, he sought to admit 39 extrinsic burglaries. The testimony on the extrinsic burglaries was more lengthy than the testimony on the charged burglaries. For the purpose of comparing the similarity of the extrinsic burglaries to the charged burglaries, the circumstances of a few of the extrinsic burglaries need to be described.

On February 21, 1983, a burglar broke into Richard Bourke's residence. No one could establish the method of entry. The burglar ransacked the home, took a pillowcase, and opened an alternative escape route.

On March 4, 1983, an intruder used a screwdriver to force the lock on Helen Mehagan's garage door. The burglar then kicked in the door leading from the garage to the kitchen. He ransacked the house and took a pillowcase.

A thief broke into Judy Gaw's residence between 5 p.m. and midnight on March 12, 1983. He broke the front door frame and a glass pane. The perpetrator ransacked the bedroom and took a pillowcase, but he did not unlock the back door to provide an alternative escape route.

On September 13, 1983, between 4:30 p.m. and 8:30 p.m., a person entered Patricia Hester's home by breaking the glass in the back door, reaching in and opening the door. The burglar ransacked the house and unlocked the front door to provide an alternative escape route. The thief, however, did not take a pillowcase.

■ Given the inherent similarities in almost all burglaries—the frequent early evening timing, the ransacking of the bedrooms, the breaking and entering in an obscure place—the *modus operandi* of these burglaries is not akin to the accused's signature. Rather, these burglaries are the mere repetition of the typical burglary.

The prejudice resulting from the admission is patent. The State did not place Gibbs on notice that he would have to defend himself against these extrinsic offenses. The volume of testimony on the extrinsic burglaries also made it difficult for the jury to distinguish between the charged and the uncharged burglaries.

Had the prosecutor wanted to admit evidence on these numerous extrinsic burglaries, he need only have charged Gibbs with the crimes. The record indicates the evidence was sufficient to convict Gibbs of both the charged burglaries and the extrinsic burglaries.

■ To decide if the admission of the extrinsic offenses is harmless with regard to any of the convictions, we judge whether the jury's verdict was substantially swayed by the erroneous admission of the prejudicial evidence. *Stwalley v. State* (1989), Ind., 534 N.E.2d 229; *Miller v. State* (1982), Ind., 436 N.E.2d 1113. The admission of the extrinsic offenses may be considered harmless as to two sets of the burglary and theft convictions. The evidence on these crimes differs from that offered on others in that it connects the defendant so closely to the offense that is is difficult to imagine the jury reaching any decision other than guilty.

In one burglary and theft, an eyewitness placed Gibbs at the scene with stolen property. That burglary occurred on September 23, 1983 at Helen Wallace's house. A neighbor of Wallace, Joseph Huffman, saw a car parked under a streetlight on the night of the burglary. He identified Gibbs' car as the one he saw that night. Huffman observed Gibbs pick up a pillowcase, put it in the car, and drive away.

In another, Stephen Pitts was helping his mother-in-law remodel her house on October 3, 1983. She lived two houses to the east of him. Upon leaving, Pitts noticed a cream colored Olds 98 parked near his mother-in-law's house and a few houses down from his own home. Pitts had not seen the car in the neighborhood before. When he got home, he found his home broken into and a television, microwave oven, two diamond rings, and a stereo system taken. Pitts later identified the car as Gibbs.

We affirm the four conviction arising out of these events.

### IV. *Additional Issues*

Gibbs raised several other issues in challenging his convictions. We will only address those issues relating to the Wallace and Pitts burglary and theft convictions.

**A. *Discovery Violation.*** Gibbs maintains the State failed to correct inaccurate information in the senior investigative officer's deposition. In the deposition, the officer said he could not recall any eyewitnesses to the charged crimes. Huffman later told the officer that he could identify Gibbs. The officer never corrected his previous statement. Gibbs sought to dismiss the charges. The trial court ruled that the sanction Gibbs requested was disproportionate to the alleged infraction and ordered the State to update any other information that might be misleading.

The purpose of pretrial discovery is to promote justice and to prevent surprise. *Murphy v. State* (1986), Ind., 499 N.E.2d 1077. When the State violates a discovery order, the normal remedy is a continuance. If the trial court finds that the State improperly withheld evidence, the court can exclude the evidence. *Carter v. State* (1987), Ind., 512 N.E.2d 158.

The trial court ruled that the police officer did not deliberately mislead Gibbs. The trial court has wide discretion when imposing sanctions for a discovery violation. *Id.* at 170. Judge Spencer properly refused Gibbs' request for dismissal on this ground.

**B. *Testimony on Terminal Illness.*** Gibbs suggests that the prosecutor improperly appealed to the sympathies of the jury by eliciting testimony from one of the State's witnesses that his daughter had a terminal illness. The witness, William Spurgeon, testified that Gibbs brought him stolen goods and in return he would give Gibbs money. In order to attack Spurgeon's credibility, Gibbs cross-examined Spurgeon on his stay at two hospital psychiatric units. On redirect examination, the State asked Spurgeon if there was a tragedy in his life that lead to the hospitalization. Gibbs objected, but the trial court allowed Spurgeon to testify about the terminal illness of his daughter. We conclude that the trial court acted within the range of its discretion when it allowed the State to rehabilitate Spurgeon's credibility following Gibbs' questions.

**C. *Separation of Witnesses.*** Gibbs argues that his convictions should be reversed because the State violated an order for separation of witnesses. Spurgeon testified that White came into the prosecutor's office while the prosecutor was interviewing him about various items that Gibbs had wanted to exchange. Spurgeon said that White could not have heard very much because he was picking out items from the police list and not talking. The trial court denied Gibbs' motion to strike the testimony. In these matters, we grant trial courts wide discretion. *Goolsby v. State* (1987), Ind., 517 N.E.2d 54. The trial court was within its discretion in this ruling.

D. *Prosecutor's Conduct.* Gibbs raises a number of arguments relating to the prosecutor's conduct at trial. Specifically, he maintains the prosecutor made a number of prejudicial comments, elicited testimony on Gibbs' misconduct, sought to offer inadmissible evidence, and disclosed Gibbs' parole status.

During the trial, the prosecutor said, "We are not trying to hide anything," and "I want the jury to see the truth." He also said that Gibbs was not charged for the extrinsic burglaries "out of the goodness of the State's heart." These statements are inappropriate, but they did not

place Gibbs in grave peril. *Maldonado v. State* (1976), 265 Ind. 492, 355 N.E.2d 843.

 The prosecutor elicited testimony that Gibbs used drugs, carried a gun, and drove his car over the speed limit. Gibbs did not object at trial to the testimony on his drug use and his carrying of a gun; he waived any error on that testimony. The testimony on Gibbs' speeding was relevant to rebut his alibi. Gibbs offered alibi evidence that he was in Alabama, Michigan and Ohio near the time of some of the burglaries. Evidence on speeding was relevant to show that Gibbs might also have been in Indiana to commit the crimes.

The prosecutor sought to admit stolen property from two burglaries through the testimony of a police officer. The police officer would have testified that the victims identified the stolen property as belonging to them. Gibbs objected on hearsay grounds because neither victim was available for cross-examination. Gibbs' counsel accused the prosecutor of deliberately trying to place into evidence exhibits that were not admissible. After a heated and extended argument between Gibbs' counsel and the prosecutor, the trial court denied Gibbs' motion for a mistrial. The trial court did, however, admonish the jury to disregard the testimony and the exhibits. We can find no error in the trial court's action.

Finally, Gibbs claims the prosecutor intentionally tried to inform the jury of Gibbs' status as a parolee. For example, White's nephew, Clayton Rice, testified that Gibbs placed his car in White's name so that Gibbs' probation officer would not find out about it. Gibbs' counsel moved for a mistrial claiming that the prosecutor deliberately attempted to inform the jury of Gibbs' parole status. The trial court held that the question was proper because Gibbs opened the door to such testimony by asking Rice who the car was registered to. Nonetheless, the judge admonished the jury to disregard any reference to Gibbs being on probation or parole. The trial court's ruling was correct.

### V. Conclusion

We affirm those convictions relating to the Wallace and Pitts burglary, counts XXI, XXII, XXXIII and XXXIV of the information. Gibbs did not challenge the habitual offender determination, and it stands. We remand the case to the trial court for entry of a revised sentencing order with respect to those penalties which are being affirmed, the ten-year sentences for counts XXI and XXXIII, the two-year sentences for counts XXII and XXXIV, and the thirty year enhancement for being an habitual offender, a total of 54 years.

The cause is remanded for a new trial on the other charges.

DeBRULER, GIVAN, PIVARNIK and DICKSON, JJ., concur.