Deborah Denise BROWN, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 45S00–8703–CR–271.

Supreme Court of Indiana.

Aug. 29, 1991.

Daniel Toomey, Merrillville, for appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

SHEPARD, Chief Justice.

Following a jury trial, Deborah Denise Brown was convicted of murder, a felony, Ind.Code § 35-42-1-1; attempted murder, a class A felony, Ind.Code §§ 35-41-5-1(a), 35-42-1-1; and child molesting, a class A felony, Ind.Code § 35-42-4-3(a). After the penalty phase of the trial, the jury recommended the death penalty.[1] The trial court sentenced Brown to death. Brown raises five issues in this direct appeal:

    I. Did the trial court err in admitting the in-court identification of Brown by a witness who had previously participated in an unduly suggestive identification procedure?

    II. Did the court err in admitting evidence of an extrinsic offense to prove the identity of the defendant?

    III. Did the trial court err in admitting evidence of Brown's oral confession?

    IV. Did the court err by admitting in the penalty phase of the trial a videotape of Brown's previous testimony?

    V. Did the trial court err in rejecting the defendant's first instruction in the penalty phase of the trial?

*Facts*

The evidence supporting the jury's verdict reveals that on June 18, 1984, A.H., then age nine, and her niece, Tamika Turks, then age seven, were walking back to Tamika's house after a trip to a candy store and a hot dog stand in Gary. A man and a woman, Alton Coleman and Deborah Brown, approached the girls. Coleman asked the children if they wanted some clothes. They seemed agreeable, and Coleman asked them to follow Brown. Coleman said he would catch up with them later. Although Tamika commented to A.H. along the way that they should not have gone with these people, the children accompanied Brown on a walk to a secluded, wooded area. The walk was approximately 1.4 miles long, and was estimated to have taken 40 minutes for small children.

Coleman caught up with Brown and the children. At the woods he announced he was going to play a game. The adults removed Tamika's shirt and Brown then cut the shirt into strips which were used to tie up the hands, legs, and mouths of the children. At this point, Tamika began to cry and the attackers pushed her down. While Brown held Tamika's nose and mouth, Coleman stomped on Tamika's stomach and chest. The two assailants carried Tamika a short distance away, hidden in weeds out of A.H.'s view.

A.H. was then forced to perform oral sex on both Coleman and Brown. Coleman revealed a partially concealed gun and threatened to kill Annie if she did not comply.

---

1. The State sought the death penalty based on any of three aggravating circumstances: the intentional killing of Tamika Turks while committing or attempting to commit child molesting upon A.H., Ind.Code § 35-50-2-9(b)(1); Brown's previous conviction on two counts of murder in the Court of Common Pleas, Hamilton County, Ohio, under Cause No. B-843548, Ind.Code § 35-50-2-9(b)(7); and Brown's previous conviction on two counts of murder in that same court under Cause No. B-842559, Ind. Code § 35-50-2-9(b)(7).

He then raped A.H. Afterwards, A.H. heard a loud moan coming from where the two had taken Tamika. Brown stated that the girl was not dead yet, and went over to the area where Tamika was.

When Brown returned, she and Coleman began choking A.H. with their belts. A.H. lost consciousness. When she awoke, the assailants were gone. A.H. stumbled back out of the wooded area. She was discovered by a woman who called A.H.'s mother and an ambulance. Tamika lay dead in the woods.

In the trial court, Brown was convicted of the murder of Tamika Turks, of the attempted murder of A.H., and of molesting A.H.

## I. Could A.H. Properly Identify Brown?

■ Brown first asserts the trial court erred in permitting A.H. to identify her in court. Brown contends that the identification was tainted because A.H. had previously been shown a single photograph of the defendant before she testified at the trial of Alton Coleman in Ohio. An Ohio prosecutor had shown her Brown's picture and asked, "Can you identify this person?" The trial court held a hearing on Brown's motion to suppress A.H.'s identification; it denied the motion. Brown contends that this constitutes reversible error.

■ This Court has long held that extrajudicial exhibition of a single photograph to a victim is an unduly suggestive identification procedure. *Parker v. State* (1976), 265 Ind. 595, 358 N.E.2d 110; *Emerson v. State* (1972), 259 Ind. 399, 287 N.E.2d 867. As a result, "[d]irect eyewitness identification at trial is inadmissible if pre-trial photographic identification procedures which preceded it were so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Haun v. State* (1983), Ind., 451 N.E.2d 1072, 1075; *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). This Court has repeatedly held, however, that "an in-court identification by a witness who has participated in an impermissibly suggestive out-of-court identification is admissible if the witness has an independent basis for the in-court identification." *French v. State* (1987), Ind., 516 N.E.2d 40, 42; *Henson v. State* (1984), Ind., 467 N.E.2d 750.

■ To determine whether A.H.'s in-court identification was permissible in Brown's trial requires determining whether there was clear and convincing evidence that the witness had an adequate independent basis for her in-court identification. *See Heiman v. State* (1987), Ind., 511 N.E.2d 458, 460. This review searches "the totality of the circumstances pertaining to the witness' opportunity to observe the perpetrator during the commission of the crime...." *Dorsey v. State* (1986), Ind., 490 N.E.2d 260, 267; *see also Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). Among the pertinent factors are "the length of time the witness was in the presence of the perpetrator, the distance the witness was from him, the lighting conditions at the time, the witness' capacity for observation, and the opportunity to observe particular characteristics of the perpetrator." *Dorsey*, 490 N.E.2d at 267; *see also Biggers*, 409 U.S. 188 at 199, 93 S.Ct. 375 at 382.

The evidence suggests that A.H. was in the company of Brown for at least forty minutes, the time it was estimated to take for a child to walk with Brown to the park where the attack occurred. This walk and the subsequent attack took place in broad daylight, providing ample opportunity for a good look. A.H.'s eye doctor testified that the child could recognize anybody up to six or seven feet away. Record at 2319 (testimony of Dr. Raymond Carmody at suppression hearing). Based on the nature of the attack, A.H. was so close to Brown that her nearsightedness and lack of glasses would not have prevented her from perceiving and describing appellant. A.H.'s identification of Brown at trial was unequivocal, and she emphasized that her identification was based on her experience in the woods on the day of the incident. Furthermore, A.H. had already tentatively identified the defendant in a line up in which her nearsightedness may have come into play. *Id.* at 2273–77 (testimony of Mary Hillard); *id.* at

2296–97 (testimony of Lieutenant Kenneth Barnes). She had also earlier ruled out as suspects people shown to her who were not her assailants, *id.* at 2306–07 (testimony of Barnes).

Given these facts, covering the breadth of conditions mentioned in *Dorsey,* 490 N.E.2d at 267, there is clear and convincing evidence that A.H.'s in-court identification was based upon observations gained independently of any unduly suggestive pretrial procedure. A.H.'s in-court identification of Brown was properly admitted at trial.

## II. Evidence of an Extrinsic Offense

■ Appellant next contests the admission of evidence of an extrinsic offense, the Ohio murder of Tonnie Storey, during the guilt phase of her trial.[2] Evidence of crimes extrinsic to the one for which a defendant is on trial is generally inadmissible in Indiana. *Malone v. State* (1982), Ind., 441 N.E.2d 1339. Long-recognized exceptions to this rule, however, provide that "[e]vidence of other criminal activity may be admissible in certain cases to prove an accused's identity, knowledge, intent or motive, or to demonstrate the common plan or scheme of criminal activity from which the accused originated the charged crime." *Id.* at 1346. Because such evidence can often be unduly prejudicial, however, exceptions to the rule are to be applied cautiously. *Gibbs v. State* (1989), Ind., 538 N.E.2d 937; *Penley v. State* (1987), 506 N.E.2d 806.

■ The parties to this litigation argue the admissibility of the Storey evidence on two recognized exceptions to the extrinsic offense exclusionary rule. One exception allows in evidence of extrinsic crimes shown to be part of a larger preconceived plan that includes the charged offense. *Gibbs,* 538 N.E.2d at 939; *Penley,* 506 N.E.2d at 809. The second category allows admission of extrinsic evidence to prove identity by showing the defendant commit-

ted other crimes with a similar modus operandi. *Penley,* 506 N.E.2d at 808–09.

■ Brown argues that evidence of the extrinsic offense admitted at trial falls within neither category of exceptions. Because we find that the uncharged crime satisfies the identity/modus operandi exception to the general rule, we need not address Brown's claim that the State did not prove the charged and uncharged crimes were part of a larger preconceived plan.

■ The use of modus operandi evidence to prove identity requires the State to show "that the similarities between the two crimes are so strong and the method so clearly unique that it is highly probable that the perpetrator of both is the same person." *Penley,* 506 N.E.2d at 809. The mere repetition of similar crimes will not suffice to qualify as an exception to the general rule. *Gibbs,* 538 N.E.2d at 939; *Malone,* 441 N.E.2d at 1346. Instead, "this Court requires a strong showing that the different criminal actions were so similarly conducted that the method of conduct can be considered akin to the accused's 'signature.' " *Malone,* 441 N.E.2d at 1346; *Gibbs,* 538 N.E.2d at 939.

The facts of the Ohio murder and the Gary incident were sufficiently similar to constitute signature crimes. Tonnie Storey, like A.H. and Tamika Turks, was a young black female. Storey was last seen alive in Ohio walking down the street with a man identified as Alton Coleman and a slender woman, lighter in complexion than Coleman, with her hair in braids with beads. Record at 2684–89 (testimony of Yvette Lewis). A.H. had also described the pair she and Tamika walked with in Gary as Alton Coleman and a skinny black female, lighter in complexion than Coleman, with her hair in French braids. Tamika and A.H. were walked a distance away from where they met Brown and Coleman to an isolated area for the attack. The body of Storey was found in a gutted building in a deserted area six blocks from

---

2. All evidence presented at the guilt phase of trial was later incorporated into the penalty phase. Record at 3400. Defendant's objection therefore runs to the evidence's effect at the penalty phase as well. Brief of Appellant at 83–84.

where Storey was last seen. Record at 2698–99 (testimony of Officer Dianne Arnold).

Once at the wooded area in Gary, the attackers removed Tamika's pink shirt and Brown cut it into strips of cloth with a knife. Strips were used to bind the hands, legs, and mouths of the children. Record at 2470–71 (testimony of A.H.). Pink cloth pieces were recovered by police in the woods near the body of Tamika. A ripped blue blouse was also found near the shirtless body of Tonnie Storey. Ripped strips of blue fabric, some of them knotted, were found at the scene. These strips of fabric appeared to be the same material as the ripped top. Record at 2731–33.

Tamika died of asphyxia by strangulation. She was strangled with an elastic strip of a bedsheet. Storey also died from asphyxia by strangulation. A white sheet and strips of that sheet, some of them possibly knotted, were found at the vacant building. Record at 2734. Also found at the building was a Michael Jackson button with Brown's fingerprint on it; Tamika's Michael Jackson medallion was found near her corpse in Gary. Taken all together, the evidence supports a finding that the Indiana and Ohio crimes are distinctive enough to constitute signature crimes rather than the mere repetition of similar crimes.

■ Brown argues that there was insufficient evidence presented to show that it was she who committed the murder of Tonnie Storey. For evidence of an extrinsic offense to be admissible under the modus operandi exception, the defendant must have committed the extrinsic offense. *Gibbs*, 538 N.E.2d at 939–40. Circumstantial evidence can suffice to show the defendant committed the extrinsic offense. *Gibbs*, 538 N.E.2d at 940; *Foust v. State* (1981), Ind., 428 N.E.2d 776. The evidence

outlined above was sufficient to tie Brown to the extrinsic murder.[3]

■ Brown further contends that evidence of the extrinsic offense was not needed to prove identity at her trial. Normally, evidence which is merely cumulative is not grounds for reversal. *Sharp v. State* (1989), Ind., 534 N.E.2d 708, *cert. denied* — U.S. —, 110 S.Ct. 1481, 108 L.Ed.2d 617 (1990). In the case of extrinsic offenses, however, we have held that "if identification of an accused can be proved by other evidence or if an accused's identity is not a material issue, then the admission of evidence of other criminal activity is improper to establish identity." *Malone*, 441 N.E.2d at 1346.

Identity was a material issue in this case. Brown argues that the extrinsic offense should not have been admissible because the State had A.H.'s eyewitness testimony, the defendant's oral confession, and some circumstantial evidence to prove identity. The principal direct evidence identifying Brown as the assailant in Gary was Brown's oral confession and A.H.'s testimony. The admissibility of both of these pieces of evidence was strongly contested by the defendant at both the trial and appellate level. Because identity was still at issue, it was proper to admit evidence of the extrinsic offense to establish identity.

Brown last charges that the probative value of the extrinsic offense evidence was outweighed by its prejudicial nature. In support of this argument, however, appellant merely restates the proposition that as a general rule evidence of extrinsic offenses is prejudicial and thus not admissible unless within one of the narrow categories of exceptions discussed above. *See, e.g., Porter v. State* (1979), 272 Ind. 267, 270–71, 397 N.E.2d 269, 272; Brief of Appellant at 82–84. We have already found that the facts presented fall within an admissible exception to the general rule.

3. Furthermore, viewing the record of the trial as a whole, we note that the charging instruments and penalty phase of the trial established that Brown had been previously found guilty in Ohio of the murder of Tonnie Storey. Under these circumstances, where the defendant was elsewhere found guilty of the uncharged crime be-

yond a reasonable doubt, we fail to see how a trial court could commit reversible error by finding on other grounds that the State met its threshold burden of showing the defendant committed the extrinsic offense. *Cf. Gibbs*, 538 N.E.2d at 940.

### III.  Admissibility of Brown's Confession

On July 20, 1984, Brown was arrested and taken to the Evanston Police Department in Evanston, Illinois.  At 1 p.m., Brown was advised of her rights by F.B.I. Special Agent James Gretz.  At 1:04 p.m., Brown acknowledged that she understood her rights but that she did not want to sign the waiver of rights form, and she asked to speak to an attorney.

Agent Gretz continued to question Brown, collecting background information such as her name, address, date of birth, and the like.  Record at 1769–75.  Evanston Detective Sergeant Charles Schockweiler also questioned Brown at that time.  He asked her whether or not she or Alton Coleman had been involved with anyone in the Evanston area who might be injured, where she had stayed in Evanston, and whether she had gone to a particular store. Brown responded to this questioning.  *Id.* at 1775–78.  The entire interview lasted until 1:38 p.m.  *Id.* at 1779.

At 1:51 p.m., appellant was told that she was being placed in federal custody and would be taken to the Federal Building in Chicago.  At 2:24 p.m., Brown was placed in a car to be transported to Chicago.  In the car were F.B.I. Special Agents Gretz, Denise Buten and Burdena Pasanelli. Agent Pasanelli testified that she was not aware at this time that appellant had made a prior request to speak to an attorney.  At the suppression hearing, Agent Pasanelli described conversations that occurred on route to Chicago.

Shortly into the ride, Brown initiated the first conversation in the car, asking Agent Pasanelli "what she was charged with." Record at 1700.  Pasanelli explained to Brown that she was charged on a federal material witness warrant and that she was wanted for the kidnapping of Donna Williams and on an unlawful flight warrant.  The agent also informed Brown of some charges in Detroit.  Pasanelli did not further explain the meaning of the charges, the possible penalties, or the like.  *Id.* at 1700–02.

After this first exchange, Brown again initiated conversation with law enforcement officials in the car.  She asked Agent Pasanelli "what was going to happen to her."  Record at 1702.  Pasanelli explained to Brown that she was in federal custody, that she was being taken to the Federal Building in Chicago, that she would be processed as a federal prisoner, and that eventually she would appear before a magistrate who would determine if she were the person named in the warrant and would set bond.  Record at 1702–03.

After this exchange, Brown again questioned the agents.  She wanted to know "where she was going."  Record at 1703. Pasanelli told her that she would be going to the Metropolitan Correction Center in Chicago if she did not get out on bond. Record at 1703.  Later, Brown again initiated dialogue with the agents.  She asked "if anyone had talked to anybody in her family."  Record at 1703.  Agent Buten had spoken with Brown's mother and told Brown that her mother and family were concerned about her.  Record at 1703–04.

Later in the ride, either Agent Buten or Agent Pasanelli asked Brown if she was feeling okay.  Record at 1704.  Agent Pasanelli then showed Brown photographs of herself and Alton Coleman and asked Brown what had happened to her pretty smile.  These photographs had been circulated by the F.B.I. as part of a fugitive investigation to locate Coleman and Brown. Brown responded that she was the person in the photographs.  Record at 1704–08.

The car arrived at the Federal Building in Chicago at approximately 2:50 p.m. Record at 1710.  At the Federal Building, Brown was taken to an F.B.I. interview room.  Record at 1712.  Following F.B.I. procedure, Brown was then told what she was charged with, and given an opportunity to make a statement to the agents. Reading the outstanding warrants to Brown took approximately forty-five minutes, which included time taken by Pasanelli to explain the charges and the people involved in each case.  Record at 1715–16.

Brown was then asked if she wanted to tell the agents about her travels with Cole-

man. She said she would as long as she could stop at any time. At this point Brown was again advised of her rights. She was asked if she understood her rights, and she said she did. She was read the waiver form by Agent Gretz and asked again if she was willing to answer questions. She acknowledged that she would answer questions. As she had at the Evanston Police Department, however, Brown refused to sign the waiver form. Record at 1716–17.

Brown was given cigarettes, soda pop, and a chance to use the restroom. The F.B.I. agents did not make promises or inducements to procure the statement from Brown. At the beginning of the interview she was simply told that Coleman was in another interview room being given the opportunity to give a statement. Record at 1743.

Brown proceeded to give an oral confession to the agents. The entire interview began at around 3 p.m. and concluded at 5:33 p.m. when Brown asked to speak with her attorney. At that point, Brown gave the agents the name and phone number of her attorney for the first time. Record at 1816 (testimony of Agent Gretz).

Brown now appeals the trial court's admission into evidence of the confession made at the Federal Building. Determining the admissibility of the confession made in Chicago requires an examination of each of the exchanges between Brown and law enforcement officials made after her first request for an attorney at 1:04 p.m. on July 20, 1984. This requires a consideration of Brown's statements to Gretz and Schockweiler, in addition to her 3 p.m. oral confession.

The fifth and fourteenth amendments to the United States Constitution guarantee a suspect the right to the presence and advice of counsel during custodial interrogation by the police. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "When the right to have counsel is asserted, the suspect is not subject to further interrogation until counsel has been made available to him unless the suspect himself initiates further communication

with the police and knowingly and intelligently waives the right previously invoked." *Sleek v. State* (1986), Ind., 499 N.E.2d 751, 754 (citing *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), and *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)); *see also Grimm v. State* (1990), Ind., 556 N.E.2d 1327.

■ Agent Gretz and Detective Schockweiler continued to question Brown in Evanston after Brown had requested an attorney and without any initiation by the defendant. Gretz's discussion with Brown, however, did not implicate Brown's *Miranda* rights. Obtaining routine booking information from a defendant does not amount to illegal custodial interrogation by a police officer. *See, e.g., Boarman v. State* (1987), Ind., 509 N.E.2d 177, 180–81.

Detective Schockweiler apparently continued to ask substantive questions of the defendant after she had requested an attorney. Such an exchange, without initiation by the defendant, would appear to violate Brown's *Miranda* rights. Because the results of this exchange were not entered into evidence, however, there is no need to suppress any improper exchange.

■ Any later statement by Brown is not necessarily tainted by prior inadmissible statements to Schockweiler. *Abner v. State* (1985), Ind., 479 N.E.2d 1254, 1260 ("a prior involuntary confession does not render subsequent statements inadmissible *per se* "); *Johnson v. State* (1978), 269 Ind. 370, 378–79, 380 N.E.2d 1236, 1241. Instead, "the voluntariness of any custodial statement must be determined from an examination of the totality of the facts surrounding its making." *Johnson,* 269 Ind. at 378, 380 N.E.2d at 1241. To determine the admissibility of Brown's oral confession made two hours after her initial request for an attorney therefore requires examining the totality of facts to determine whether (1) Brown initiated further communication with the police, and, (2) if so, whether she knowingly and intelligently waived the rights she previously invoked. *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830; *Sleek,* 499 N.E.2d 751.

In *Oregon v. Bradshaw*, the Supreme Court found that a defendant's statement to police, "Well, what is going to happen to me now?", was sufficient to find that a defendant initiated dialogue with the police. *Bradshaw*, 462 U.S. at 1045–46, 103 S.Ct. at 2834–35 (plurality opinion); *Id.* at 1050, 103 S.Ct. at 2837 (Powell, J., concurring) (agreeing that, looking to totality of circumstances, valid waiver occurred). The Court concluded that "[a]lthough ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship." *Id.* at 1045–46, 103 S.Ct. at 2834–35 (plurality opinion). In the instant case, Brown initiated fresh dialogue in the car with exactly the same question found to be initiation in *Bradshaw*. Furthermore, Brown initiated several more discussions along the same lines during the ride to Chicago. These discussions were separated in time, space, and subject matter from the questioning that occurred in the Evanston Police Department after Brown's initial request for an attorney. The facts of this case support a finding that Brown initiated further communication with law enforcement officials.

Brown's initiation of discussion with officers meets the first part of the test of admissibility of her oral statement. The initiation of dialogue, however, does not alone suffice to show a waiver of the previously invoked right. *Doerner v. State* (1986), Ind., 500 N.E.2d 1178, 1180. A separate inquiry is required to determine whether the defendant knowingly and intelligently waived the previously asserted right. *Id.; Sleek*, 499 N.E.2d 751; *Bradshaw*, 462 U.S. at 1039, 103 S.Ct. at 2832 (plurality opinion).

An analysis of the totality of the circumstances supports the trial court's finding that Brown knowingly and intelligently waived her previously asserted right. Brown asked for an attorney at 1:04 p.m., and some questioning continued until 1:38 p.m. Brown's initiation of dialogue in the car did not occur until at least 2:24 p.m., however, away from both the Evanston Police Department and the officers who questioned her and from whom she requested an attorney. Brown initiated general conversations with the new officers on several distinct occasions during the car ride. On arrival at Chicago, Brown was again advised of her rights. She acknowledged that she understood these rights. Furthermore, she not only refused to sign the waiver form, but she also insisted that she would only talk if she could stop at any time. At 5:33 p.m. she exercised this right. She requested her attorney, whereupon all interrogation stopped. Unlike the occasion of her first request for counsel, at 5:33 p.m. she gave officers the name and phone number of her attorney. No inducements or threats were made by law enforcement officials to gain the confession. Additionally, Brown did not give her oral confession until after 3 p.m., an event separated in space, time, and subject matter from her original request for an attorney in Evanston.

## IV. Admissibility of the Videotape

During the penalty phase of Brown's trial, the State offered into evidence a videotape of Brown testifying at an earlier trial in Ohio. Brown contends the trial court erred in admitting the videotape. *Lamar v. State* (1972), 258 Ind. 504, 282 N.E.2d 795, establishes a set of foundational requirements that must be met for a tape recording to be admitted into evidence. These requirements apply to videotapes as well. *Smith v. State* (1979), 272 Ind. 328, 397 N.E.2d 959. Brown asserts that the tape at issue was unintelligible and unenlightening to the jury and thus failed to satisfy the fifth foundational requirement of *Lamar*.

Brown argues in part that the tape was confusing because some people who questioned her on the tape are not identified; some questions and comments overheard cannot be related to anyone depicted on the tape; some of her testimony was blurred; and the proceedings depicted were chaotic. For a tape to be admissible under *Lamar*, however, we do not require

that every word be intelligible. We require only that, taken as a whole, the tape must be of such clarity that it does not lead the jury to speculate about its contents. *Patton v. State* (1986), Ind., 501 N.E.2d 436. The trial court has wide discretion in determining whether or not these requirements have been met. *Hobson v. State* (1984), Ind., 471 N.E.2d 281. We reverse only on finding an abuse of that discretion. *Wallace v. State* (1986), Ind., 498 N.E.2d 961.

Having reviewed the videotape, *see Lamar*, 258 Ind. at 510–12, 282 N.E.2d 795, we find no error in the court's ruling on this point. The trial court rejection of Brown's objections was buttressed by the fact that an official court transcript of the Ohio proceeding depicted in the tape was also in evidence. When an official court transcript of a videotape's contents is admitted, the clarity of the tape itself is obviously less important.

▆▆▆ Brown also complains that the tape of her testimony was prejudicial because it contains several gaps. To be admissible, a tape must be complete enough to avoid speculation in the minds of jurors as to its contents. *Patton*, 501 N.E.2d at 438. Here, the videotape was created by members of the media present in the Ohio courtroom. The tape contains several unexplained gaps in Brown's testimony. After a showing of the tape, the contents of the unexplained gaps in the video were read to the jury from the complete court transcript of the Ohio proceedings. Using the official transcript to fill in gaps in the tape was sufficient to avoid any impermissible speculation by the jurors about the missing contents.

▆▆▆ Brown next argues that the tape was inadmissible because it contains material not otherwise admissible. In general, she argues the tape contains evidence of uncharged crimes which are inadmissible evidence of bad character. The tape and transcript depict Brown testifying at an Ohio trial of Alton Coleman. Brown testified that she willingly and independently murdered Marlene Walters by beating her with a vice grip, pop bottle, candy dish, and crowbar. There is also reference to the murder of Tonnie Storey.

The State offered this evidence, previously discussed with the defendant's expert witnesses, as rebuttal to Brown's mitigation evidence. The defense sought to demonstrate Brown's general lack of aggressiveness, substantial domination by Coleman, and borderline retardation. Ind.Code § 35-50-2-9(c). Defense experts testified that Brown had a passive dependant personality. *See, e.g.*, record at 3532–33 (testimony of psychiatrist Jonathan Kelly, M.D.); *id.* at 3691 (testimony of clinical psychologist Dr. Vernon Suran). Both doctors suggested that Brown was acting under the influence of Alton Coleman. *See, e.g., id.* at 3532–33 (testimony of Kelly); *id.* at 3718 (testimony of Suran). Doctor Suran testified that examination of Brown's tests did not show evidence of hostile or aggressive tendencies. *Id.* at 3689–90. Doctor Kelly did not find evidence of an antisocial personality disorder either. *Id.* at 3536. Both doctors testified that Brown had a borderline retarded intelligence. *Id.* at 3524–25 (testimony of Kelly); *id.* at 3692 (testimony of Suran). On cross-examination, Dr. Kelly testified that a videotape of Brown testifying at trial could be indicative of Brown's intelligence level. *Id.* at 3558–59.

▆▆▆ After discussing the videotape with both doctors, the State offered the tape and accompanying transcript solely to rebut the defendant's proffered mitigating evidence. *See id.* at 3860 (trial court admonishes jury that tape is admissible only to rebut evidence of mitigating factors and not as direct evidence of aggravating circumstances). Brown appears to argue that this evidence of uncharged crimes is inadmissible as evidence of bad character and thus should not have been allowed into evidence.[4] Since we find that the tape was

---

4. Appellant also complains that inadmissible references to uncharged robberies are included in the tape. The tape's passing references to uncharged robberies do not constitute reversible error. By the time of the penalty phase of the trial, the jury had heard evidence in the guilt phase of the brutal murder of Tamika Turks and the molestation and attempted murder of

properly within the scope of rebuttal for the State, we need not address Brown's additional claim that the tape was not admissible to rebut the charge that Brown had no significant history of prior criminal conduct. Brief of Appellant at 97–98.

■ Evidence of a defendant's commission of unrelated crimes is generally inadmissible to prove guilt. *Storey v. State* (1990), Ind., 552 N.E.2d 477; *Bond v. State* (1980), 273 Ind. 233, 403 N.E.2d 812. At the penalty phase of trial, however, the guilt of the defendant has already been established. In fact, the death penalty statute permits evidence of extrinsic crimes to be proven as aggravators at this stage. Ind.Code § 35–50–2–9(b). Here, the State had already introduced evidence of the murders of Walters and Storey as aggravating circumstances earlier in the penalty phase. Ind.Code § 35–50–2–9(b)(7). The jury had also previously heard details of the Storey murder during the guilt phase of Brown's trial.

■ As indicated by the admonitions of the trial court, though, the evidence on the tape was admitted only to rebut mitigating evidence offered by Brown. When the accused offers evidence of her own character, she opens the door to the subject of her character for the trait placed in issue. *Berkley v. State* (1986), Ind., 501 N.E.2d 399, 400; *Bond*, 273 Ind. at 240–41, 403 N.E.2d at 818. The State can then introduce evidence of specific misconduct in its rebuttal. *Bond*, 273 Ind. at 240–41, 403 N.E.2d at 818. The scope of rebuttal evidence is in the discretion of the trial court. The trial court's decision will be reversed only on a finding of abuse of discretion. *Berkley*, 501 N.E.2d at 400.

■ Evidence of past crimes may be used to refute expert testimony regarding an accused's mental condition and behavioral deficiencies. *Storey v. State*, 552 N.E.2d at 480–82; *Bond*, 273 Ind. at 240–41, 403 N.E.2d at 818. The trial court did not abuse its discretion in admitting evidence referring to extrinsic crimes to rebut the testimony of Brown's experts.

■ Brown last argues that even if the videotape does have probative value, its potential to prejudice the defendant exceeds this value and thus it was error to admit the tape, citing *Hyde v. State* (1983), Ind., 451 N.E.2d 648, and *Martin v. State* (1983), Ind., 453 N.E.2d 1001. Admitting evidence of uncharged crimes at a trial is recognized as generally prejudicial. *Gibbs*, 538 N.E.2d at 938–39. Here, however, the probative value of a witness testifying under oath in a courtroom about her own attitude towards offenses committed is also extremely high. We cannot say that the trial court erred in striking the balance that it did in admitting the tape.

### V. Rejection of Defendant's Instruction 1

■ Brown last argues that the court erred in refusing Defendant's Instruction 1 in the penalty phase of trial. This instruction stated:

The State of Indiana has alleged the aggravating circumstances following:

1. On or about June 18, 1984, in the County of Lake, and State of Indiana, Alton Coleman and Debra (sic) Denise Brown did intentionally kill Tamika

---

A.H. The jury also heard a description of the murder of Tonnie Storey in the guilt phase. And the videotape at issue describes in detail the murder of Marlene Walters. After hearing all of this evidence, the jury is unlikely to have been influenced by the mere mention of the term "robbery" on the tape without even discussion of the circumstances of that uncharged crime. *Kuchel v. State* (1991), Ind., 570 N.E.2d 910, 916.

Appellant also seems to suggest that references to a third uncharged murder on the tape should not have been admitted. Brown never points to a reference to this murder on the tape or the transcript. The claim made at trial that the State somehow imputed guilt to Brown in the tape by trying to place her in states where other murders occurred would not support reversible error. The trial court admonished the jury that the questions and demeanor of the attorneys in the tape were not admissible evidence. Record at 3875–76. Even if an explicit passing reference to an additional murder were made in the tape, its inclusion would not constitute reversible error under *Kuchel* when such lengthy discussions of other murders by the defendant were already before the jury.

Turks, while committing or attempting to commit child molesting on A.H., a female child.

2. On June 24, 1985 and on June 27, 1985, respectively, Alton Coleman and Deborah Denise Brown, were convicted of two (2) counts of Murder in the Court of Common Pleas, Hamilton County, Ohio under cause number B–843548.

3. On May 6, 1985 and on May 14, 1985, respectively, Alton Coleman and Deborah Denise Brown, were convicted of two (2) counts of Murder in the Court of Common Pleas, Hamilton County, Ohio under cause number B–842559.

Before you consider any of these circumstances as an aggravating circumstance, you must find that the circumstance has been established, beyond a reasonable doubt, by the evidence. You are not allowed to take into account any other circumstances, except those of the above which have been proved beyond a reasonable doubt, as a basis for deciding that the death penalty would be an appropriate punishment in this case.

Record at 4065.

The instructions given by the trial court listed the charged aggravators one to three. Record at 4079 (final instruction 1). The court's final instructions also told the jury that the State must prove beyond a reasonable doubt the existence of at least one of the aggravating circumstances alleged. Record at 4085 (final instruction 7). Instruction 7 given also stated that:

The jury may recommend the death penalty only if it finds:

1. that the State has proved beyond a reasonable doubt that at least one (1) of the aggravating circumstances exists; and

2. that any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances.

Record at 4086.

■ The only conceivable argument here by appellant, then, is that the court erred by not expressly limiting the possible aggravating circumstances considered by the jury to those enumerated by the State in the charging instrument. In reviewing whether the trial court erred in refusing to give an instruction, we consider whether the tendered instruction correctly states the law, whether the record supports the giving of the instruction, and whether the substance of the tendered instruction is covered by the instructions given. *Richey v. State* (1981), Ind., 426 N.E.2d 389.

Defendant's Instruction 1 misstated the nature of the aggravators charged by the State. The instruction would have informed the jury that the aggravators to be proven were that Brown *and Coleman* intentionally killed Tamika and killed two others. In fact, the aggravators in Brown's trial related only to Brown. Additionally, the proposed instruction misstated the law with respect to aggravating circumstances. *Minnick v. State* (1989), Ind., 544 N.E.2d 471, 482. The trial court thus properly refused defendant's Instruction 1.

## VI. The Sentence

This defendant was found guilty by a jury of the murder of a seven year old girl, Tamika Turks, and of child molesting and the attempted murder of a nine year old girl, A.H. The State offered three aggravating circumstances under the death penalty statute: that Brown had been convicted of two different murders in Ohio, and that Brown committed the murder of Tamika Turks while committing or attempting to commit child molesting on A.H. The trial court found each of these circumstances were proven beyond a reasonable doubt. They certainly were so proven. Evidence of the murders of Tonnie Storey and Marlene Walters in Ohio was admitted not only by the Ohio convictions entered at the penalty phase, but also through substantive evidence in both the guilt (Storey) and penalty (Walters) phase of Brown's Indiana trial.

■ The trial court relied on the three statutory aggravators in finding that the aggravators outweighed the mitigating circumstances leading to imposition of the death penalty. The trial judge, Richard W. Maroc, capably and carefully considered each of the possible mitigating factors in

detailed findings. The judge noted aspects of several mitigating circumstances. Regarding the first factor, that "the defendant has no significant history of prior criminal conduct," the court found that prior to the commission of the crimes at issue, the defendant had no significant history of criminal conduct. Supplemental record at 85. The court noted, though, that prior to murdering Tamika Turk, Brown accompanied Alton Coleman knowing that he was charged with the rape of a fourteen-year-old child and was wanted regarding the disappearance of another young girl. The court also noted that after the crimes in Gary, Brown continued to accompany Coleman and participated in other serious crimes previously enumerated and described in the findings. As Judge Maroc noted, between June 1, 1984 and July 20, 1984, Brown was charged with "by this [trial] Court's best estimate, a Class A Child Molesting, that's in this case, two Kidnappings, a total of eight counts of Robbery stemming from five separate incidents, two separate charges of Attempted Murder, four counts of Burglary, one of Attempted Burglary, and no less than six murders." Supplemental record at 68. Appellant argues that when weighing the first factor, the trial court erred in considering Brown's alliance, prior to the murder of Tamika Turk, with a person she knew was engaged in criminal behavior. In assessing the weight of Brown's lack of criminal record, the assistance she rendered to Coleman was a legitimate consideration. Moreover, given the string of murders for which Brown has been convicted, it is reasonable to give little weight to mitigating evidence showing that she had no significant history of prior criminal conduct.

The trial court next considered the second potential mitigating factor of whether the defendant was under the influence of extreme mental or emotional disturbance at the time of the murder. The court found that, although there was some evidence that the defendant was acting under "mental or emotional disturbance when the crimes herein were committed," *id.* at 86, in the court's opinion "the defendant [did] not qualify as being under a mental or emotional disturbance of such an extreme nature as to excuse her conduct in the commission of these offenses." *Id.* at 87.

Appellant argues that the trial court erred in requiring her disturbance to be so extreme as to excuse her participation in the crime. The trial court had previously found, however, that psychiatric testimony indicated Brown did have substantial capacity to appreciate the criminality of her conduct and to conform her conduct to the requirements of law. *Id.* at 67. This is sufficient to dispel the second mitigating factor. *Spranger v. State* (1986), Ind., 498 N.E.2d 931, *cert. denied* 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 536 (1987).

The fifth mitigating factor considered by the court was whether the defendant acted under the substantial domination of another person. Judge Maroc noted that Brown was "a young woman with borderline intellectual functioning with a dependent personality disorder." *Id.* at 90–91. He also noted the relationship between Brown's dependent personality and Coleman's dominant, manipulative personality. *Id.* at 91. The court determined, however, that Brown was not so substantially dominated that "she could not make a rational choice as to her own participation in repeated violent and criminal acts accompanied by repeated efforts to deceive intended victims and others to evade prosecution." *Id.*

Brown challenges the standard used by the trial court regarding what constitutes substantial domination. Overall, the court found that the domination by Coleman was not sufficient to excuse Brown's criminal conduct. We take this as a declaration that this mitigating factor was entitled to little weight. Under the facts in evidence, this finding was justified. *Cf. Spranger*, 498 N.E.2d at 947–48.

As a last possible mitigator, the court considered the possible effect of head trauma suffered by Brown as a child, and found no mitigating circumstance. All of the other possible mitigating factors in the statute were rejected by the trial court.

▉ Appellant argues that the trial court should have considered her age as a possible mitigating factor. At the time of the Gary incident, Brown was nearly twenty years old. A relatively young age can be a possible mitigating factor. *Van Cleave v. State* (1987), Ind., 517 N.E.2d 356, 374, *cert. denied,* 488 U.S. 1019, 109 S.Ct. 819, 102 L.Ed.2d 808 (1989). The level of brutality of these crimes against children, however, combined with Brown's testimony at the Ohio trial indicating her lack of conscience over her actions, serve to suggest that age is not a substantial mitigator in this case.

The record thus shows that the trial court properly considered both aggravating and mitigating circumstances and properly imposed the death penalty in accordance with the Indiana Code.

The judgment of the trial court is affirmed.

GIVAN, DICKSON and KRAHULIK, JJ., concur.

DeBRULER, J., dissents with opinion.

DeBRULER, Justice, dissenting.

The admission of a criminal suspect's confession given during custodial police interrogation, over proper trial objection, is federal constitutional error where the interrogation was not preceded by a knowing and voluntary waiver by the suspect of the right to then confer with a lawyer. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The two keys to evaluating the 3:10 p.m. decision of Brown, a decision she made in Chicago before giving her oral confession, to refuse to sign a waiver form but to go ahead and answer her interrogator's questions so long as she could stop answering at any time, are (1) the previous 1:04 p.m. conduct in Evanston of Illinois Detective Schockweiler minutes after Brown said she wanted to speak to a lawyer and (2) the previous consistent presence and role of F.B.I. agent Gretz during the entire early period of detention before 3:10 p.m.

Gretz first gave Brown her Miranda rights in Evanston at 1:04 p.m. and she responded by requesting to speak to a lawyer. Schockweiler was then present. No one attempted to aid or assist her in connecting with counsel. Instead, Gretz continued to question Brown as did Schockweiler in the presence of Gretz. Gretz was also later present in the car as Brown was transported to Chicago in federal custody. Arriving in Chicago, Gretz gave Brown her Miranda rights the second time before commencing his interrogation there which resulted in Brown's decision to submit to interrogation without counsel.

The conduct of Schockweiler at 1:04 p.m. back in Evanston, after Brown requested the opportunity to speak to a lawyer in response to her first receipt of advice of the right to counsel from Gretz, and after Gretz then finished collecting background information from Brown, is described in the testimony of Gretz. Gretz was able to describe the conduct of Schockweiler because he had made notes describing Schockweiler's conduct and refreshed his recollection from these notes. Gretz testified as follows:

Q Were you present when Detective Sergeant Schockweiler asked questions of Deborah Brown?

A I was.

Q And what questions did he ask?

A Detective Sergeant Schockweiler, because of the magnitude of the case, at that point was concerned as to whether or not there had been any other victim in the Evanston area. At that point, we did not know where Mr. Coleman or Ms. Brown had been staying and we were interested in trying to identify that as well as to determine whether or not there was anybody out there that they may have harmed, in particular whether or not anybody was injured that might need some medical assistance at that time.

\*    \*    \*    \*    \*    \*

Q What was it that Officer Schockweiler asked Deborah Brown and what were her responses?

\*    \*    \*    \*    \*    \*

A Okay, Detective Sergeant Schockweiler had asked something to the effect whether or not she or Mr. Coleman had been involved with anybody else in the Evanston area that could be injured and Ms. Brown responded by saying, "cool," and that she and Mr. Brown (sic) had stayed the previous evening with a Jackie, last name unknown, who resided in the first floor apartment on the east side of Evanston. He then said well, how long had she been staying there, and she responded by saying that she had been there two (2) to three (3) days and that Jackie has two (2) children.

Q Did Detective Schockweiler to your recollection ask any further questions?

A Yes, sir, he did.

Q What were those?

A He asked Ms. Brown if she had gone to a Salvation Army thrift store this date and she said that she had walked from Jackie's to the thrift store where she had purchased a blue shirt and some blue jeans.

That this custodial interrogation of Brown by Schockweiler after she had just expressed her desire to speak with a lawyer is an egregious violation of the constitutional rule governing the interrogation of suspects by police could not be clearer. *Edwards v. Arizona* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Her request was not respected, and her right to counsel at that point was simply overridden by Schockweiler in the presence and understanding of Gretz.

That this unlawful police conduct did not itself directly produce evidence of guilt which the State might seek to exploit is beside the point in this case. Its importance is the role that it played in the events of the next two hours which included the conversation in the car during the trip to Chicago in the company of Gretz fully described in the majority opinion, the reiteration of the Miranda rights to Brown by Gretz upon arriving in Chicago and, finally, Brown's decision to refuse to sign the waiver of counsel form but to answer questions on her own. The events immediately preceding Brown's decision in Chicago were also provided by the testimony of Gretz.

Q There's one part here that says, "you have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning." Did you ask her that precise question?

A Yes, sir, I did.

Q Did you say anything else in reference to that question?

A I asked her if she understood that sentence; she said yes.

Q Did she say anything else in response to that particular question.

A She did not.

Q And the next question, you remember you said, "If you cannot afford a lawyer, one will be appoint for you before any questioning if you wish?" Did you advise her precisely as I just mentioned her right?

A Yes, sir, I did.

Q And did you add anything to that?

A Yes, sir, I asked her if she understood what that meant, meaning that if she could not afford an attorney one would be appointed for her, and she said yes.

    \*    \*    \*    \*    \*    \*

Q Did anyone else advise her of her rights?

A No they did not.

Q After reading her the waiver of rights part of the form that we have been referring to, what happened?

A She again declined to sign the waiver form portion, but again she said she would be willing to answer our questions as long as it was understood that she could stop at any time and it was agreed to.

The interrogation commenced during which Brown gave an oral confession wherein she described her involvement in the murder of Tamika Turks and the molestation and attempted murder of Annie Hillard. The interrogation ceased at 5:33 p.m. when Brown refused to answer any additional questions and again asked to speak to her attorney. She provided Gretz with a name

and telephone number. With respect to this event, Gretz testified as follows:

Q  Is it finally—finally, is it correct that Deborah Brown was not afforded an opportunity to speak to an attorney until after her statement was taken by you?

A  She was not afforded the opportunity to speak with an attorney from the time she was arrested until the time that I placed a phone call after obtaining Mr. Hauser's name and phone number, that's correct.

Q  That was after she gave a statement to you?  ·

A  Yes, it was.

The initial overriding of Brown's express wish to speak with a lawyer by Schockweiler in the presence of Gretz, coupled with the refusal of Brown to sign the written waiver of counsel when read her rights the second time by Gretz constitute two events and circumstances within all the events and circumstances occurring between Brown's 1:04 p.m. expression of her desire to speak with a lawyer and her 3:00 p.m. agreement to speak alone and without a lawyer so long as she could stop answering questions at any time, that serve to distinguish this case from *Oregon v. Bradshaw* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). In *Bradshaw*, the suspect's initial expression of his desire to have an attorney was scrupulously honored as the officer immediately terminated the conversation when the request was made.

By contrast, here, Schockweiler commenced an interrogation after Brown expressed this same desire. Further, in *Bradshaw*, the suspect signed a written waiver of counsel before the later interrogation that resulted in the confession was initiated. By contrast, here, Brown refused to sign the written waiver of counsel deciding to counsel herself.

Bradshaw's experience with the promise by the police of the right to counsel had been positive. Brown's experience by contrast was that it was hollow. In her recent experience, her expression of the desire to speak with a lawyer would be met by more interrogation and she could not expect police to help her reach a lawyer. She was

nineteen years old at the time. There was no voluntary and intelligent waiver by Brown of her right to counsel before she gave her oral confession during custodial interrogation. It was therefore constitutional error to admit her oral confession at trial. The error was clearly not harmless beyond a reasonable doubt, and no such assertion is made by the State.